The STATE of Ohio, Appellant,

v.

EVANS, Appellee.

[Cite as *State v. Evans* (2001), 144 Ohio App.3d 539.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000565.

Decided July 13, 2001.

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellant.

*Robert R. Hastings, Jr.,* for appellee.

PAINTER, Judge.

The trial court, after initially overruling a motion to suppress, reconsidered and, based on our decision in *State v. Holt,*[1] suppressed one written and two oral statements made by the defendant-appellee, Julius Evans. We affirm the trial court's suppression of two of the statements because they were a product of coercion. But we hold that the remaining oral statement was not subject to suppression for that reason and remand the case for further proceedings.

## I. Assault Becomes Murder

The relevant facts are not disputed. In late 1998, Evans, who was then fifteen years old, was charged with felonious assault. The charge was initially dismissed without prejudice because the state could not positively identify the attacker. Evans, when questioned by the police about the assault, had declined to comment, and the victim had subsequently died from the injuries sustained in the attack without regaining consciousness. According to the officer heading the investigation, though the police were unable to proceed against Evans, he remained the prime suspect in what had become a murder investigation.

## II. Evans Confined for Unrelated Offense

In the interim, Evans was charged with an unrelated aggravated assault. He admitted his culpability for that assault and was adjudicated delinquent by the juvenile court. The court ordered Evans to be confined and to receive therapy at Hillcrest School, a residential treatment center for juvenile offenders. Hillcrest is operated by the juvenile court, and the residential treatment counselors who assumed responsibility for the care and therapy of the juveniles are employees of the court.

## III. Evans Makes Three Statements

During Evans's first two weeks in custody at Hillcrest, he made two oral statements and one written statement to the residential treatment counselors. All three incriminated him in the initial aggravated assault that had become a murder. Largely on the strength of these three statements, Evans was charged with murder.

The circumstances under which Evans made the three incriminatory statements determine the outcome of this appeal. It is undisputed that Evans was ordered to Hillcrest by the juvenile court for confinement and therapy and that

---

1. (1997), 132 Ohio App.3d 601, 725 N.E.2d 1155.

Hillcrest's counselors were employees of the court. One residential treatment counselor even stated that she considered herself to be a law enforcement officer, though other counselors did not so describe themselves.

There is also no dispute that Evans's stay at Hillcrest was involuntary. Had Evans chosen to leave Hillcrest without permission, the police would have been called, Evans would have been picked up, and he would have been returned to juvenile court to answer for a violation of the court's commitment order.

Similarly, there is no dispute that Evans was required to participate in therapy. Had Evans failed to participate, he could have been found in violation of the court order that he do so, and he would have risked transfer to a far more restrictive facility operated by the Department of Youth Services. But, initially, Evans's failure to participate meant that he would have been unable to join in group activities, and that he could not have gone home on the weekends, as other residents were eligible to do. The record is clear that, according to the staff at Hillcrest, some residents initially resisted the therapeutic indoctrination procedures, but that all juvenile residents eventually succumbed to the pressure and participated.

When Evans arrived at Hillcrest, his indoctrination to therapy required that he complete a "commitment offense paper." Evans was told to write about all the crimes that he had committed, whether or not they related to the crimes for which he had been sent to Hillcrest, and whether or not he had ever been adjudicated delinquent by the court for them. Apparently, the instructions for the paper typically included a statement that the policy of Hillcrest was to seek an account of past offenses for purposes of therapy, not prosecution. But Evans's particular instruction form, from which several pages are now missing, apparently did not include this preamble. None of the staff recalled orally advising Evans that his paper was for therapy rather than for prosecution. Nor did any member of the staff recall warning Evans that he had a right not to incriminate himself.

Hillcrest authorities deemed Evans's first attempt to complete the "commitment offense paper" unacceptable because "incomplete." The staff required that he try again. To assist him in being more thorough, a counselor provided Evans with a list of fourteen charges that had at one time been brought against him, and he was specifically told to write separately about each of them. The last of these fourteen charges was the initial aggravated assault that had become a murder. Evans submitted his more detailed "commitment offense paper" a week and a half later. What he wrote about the fourteenth charge was essentially a confession to murder.

Once Evans's "commitment offense paper" had been completed to the satisfaction of the staff, Evans was required to present the paper orally in a group-

acceptance session before his counselors and his peers. This subsequent indoctrinational step was similarly a condition of Evans's court-ordered therapy, and completion of the step was required before he could become eligible for home visits and further group participation. Evans's oral recitation of his paper was also a confession to his involvement in the death of the victim.

Finally, after Evans had submitted his revised "commitment offense paper" to the staff but the day before he presented the paper to his group, Evans was transported to the hospital to receive treatment for a medical condition. Evans rode to the hospital in a car driven by his counselor. The counselor asked Evans how someone so young had accumulated such an extensive record. Evans replied with an explanation that included further incriminating statements about his involvement in the murder.

The following week, Hillcrest's supervisor for the residential treatment counselors heard about Evans's series of confessions. He decided to report the details to Hillcrest's resident social worker, who in turn called the police. As a result of the subsequent investigation, Evans was charged with murder. Evans's three statements were crucial to the state's case against him.

Evans moved to suppress all three statements that he had made while in custody at Hillcrest. The trial court originally denied the motion to suppress, stating that Evans's three separate confessions were voluntary under the totality of the circumstances and that there had been no custodial interrogation that would have required that Evans receive *Miranda* warnings. Then, upon further consideration and a review of our decision in *State v. Holt*,[2] the court reversed itself and granted Evans's motion to suppress all three statements. The court ruled that Evans's statements were the product of a custodial interrogation by law enforcement officials and were therefore inadmissible because Evans had received no *Miranda* warnings.

The state now appeals and raises as its single assignment of error the suppression of Evans's confessions, even though he admittedly had not received *Miranda* warnings before he made the incriminating statements. We agree that *Miranda* warnings were not required under the circumstances, not because he was not in custody, but because the questioners were not law enforcement officials or their agents.

But we also hold that two of Evans's statements were nevertheless the result of coercion by the state and were therefore properly suppressed. The third statement, which was made while Evans was being transported to the hospital,

---

2. (1997), 132 Ohio App.3d 601, 725 N.E.2d 1155.

was not coerced. That statement was voluntarily given in response to a vague inquiry and should not have been suppressed.

■ Our review of a trial court's ruling on a motion to suppress is a two-step inquiry. First, the trial court's findings of fact are given deference and reviewed only for clear error.[3] Then, we engage in a *de novo* review, without deference to the trial court's conclusions, as to whether those properly supported facts meet the applicable legal standards.[4] Because the relevant facts are not in dispute, we focus on whether those facts required the suppression of Evans's statements.

## IV. Our Decision Is Limited to Constitutional Issues

Before we begin our analysis, we stress that the parties' arguments and our decision today are based solely on the constitutional questions raised. Evans limited his motion below to constitutional issues, and our review is consequently restricted. There are, however, two additional challenges that frequently appear in similar cases.

■ Evans has not asserted that his statements were protected by the testimonial privilege that prohibits a counselor from testifying about confidential communications received in the course of the professional relationship.[5] Nor does the record demonstrate whether the federal statutes pertaining to the confidentiality of patient records in federally assisted substance-abuse programs were applicable to Hillcrest.[6] Were those statutes applicable, Evans's record may have been precluded from disclosure to initiate or substantiate criminal charges or a criminal investigation.

Because these issues virtually jump out from the pages of this case, we mention them only to make clear that they are not part of our decision today—and properly so, because neither is a constitutional issue properly the subject of a motion to suppress. Rather, each is an evidentiary issue that should be considered in a motion *in limine* or at trial.

## V. The Privilege Against State Compelled Self–Incrimination

According to Section 10, Article I of the Ohio Constitution, "[n]o person shall be compelled, in any criminal case, to be a witness against himself." This

---

**3.** See *Ornelas v. United States* (1996), 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920–921; *State v. Duncan* (1998), 130 Ohio App.3d 77, 83, 719 N.E.2d 608, 613.

**4.** *Id.*

**5.** See R.C. 2317.02(G)(1) and R.C. Chapter 4757.

**6.** See Section 290dd–2, Title 42, U.S.Code.

provision of the Ohio Constitution echoes a virtually identical right guaranteed by the Fifth Amendment to the United States Constitution. Since the Fifth Amendment prohibition against compelled self-incrimination has been held applicable to the states [7] as well as to the federal government, this aspect of our opinion rests on both state and federal constitutional grounds.

■ These constitutional safeguards plainly prohibit the state from compelling a defendant to testify against himself at a criminal trial. But the prohibition against state-compelled self-incrimination has been interpreted to extend well beyond the confines of the courtroom. It extends to a person's privilege "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." [8]

■ Generally, the right to be free from state-coerced self-incrimination must be invoked or it is lost.[9] That is to say, if a person under state compulsion to make self-incriminating statements chooses to make the statements rather than to claim his constitutional privilege, then the person has not been compelled by the government, but has offered the statements voluntarily.[10] But, under certain circumstances, the right can become self-executing, and though it is not specifically invoked, the defendant is excused from asserting the privilege. In these circumstances, the privilege may be asserted later to suppress the self-incriminating statements made under state compulsion.

Two such exceptions, the *Miranda*[11] exception and the "classic penalty" exception,[12] are germane to our analysis. While it is a close call on this record, we hold that, without further factual indications that the staff at Hillcrest were acting as agents of law enforcement, the *Miranda* exception is not applicable in this case. We do hold, however, that Evans was in the "classic penalty" situation with respect to the incriminating statements that he made as a condition of his court-ordered therapy. His failure to assert his constitutional right in two instances

---

7. See *Malloy v. Hogan* (1964), 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658.

8. See *Lefkowitz v. Turley* (1973), 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281.

9. See *Roberts v. United States* (1980), 445 U.S. 552, 559, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622, 629–630.

10. See *Garner v. United States* (1976), 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370, 377; *United States v. Monia* (1943), 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376, 379–380.

11. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

12. See *Minnesota v. Murphy* (1984), 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409.

was excused because its assertion would have been penalized. But, regarding the statement made in the car, Evans was under no compulsion to answer, and his response in casual conversation was voluntary. That third statement should not have been suppressed.

## A. Miranda and Self-Incrimination

Under *Miranda v. Arizona*,[13] the state may not use incriminating statements made during a custodial interrogation unless it proves that procedural safeguards resulted in the defendant's voluntary waiver of his constitutional privilege against self-incrimination. These procedural safeguards include informing the defendant, before interrogation, of his right to remain silent, his right to speak with an attorney, and his right to have an attorney present during questioning. Where a defendant is entitled to these procedural safeguards, or *Miranda* warnings, and the state has failed to inform the defendant of his rights, any incriminating statements made during a custodial interrogation must be suppressed at trial.[14]

But the *Miranda* warnings need only be given during custodial interrogation.[15] Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [16] Thus, where the defendant is (1) in custody, and (2) subjected to interrogation, by (3) law enforcement officials, the *Miranda* warnings are required, and their omission requires that the defendant's statements be suppressed at trial.

There is little doubt that Evans was in custody. A suspect is in custody for purposes of *Miranda* if a reasonable person in the suspect's situation [17] would have understood his freedom of action to be curtailed to a "degree associated with a formal arrest." [18] As the court-ordered guest of a court-operated

13. (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

14. See *Harris v. New York* (1971), 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1.

15. See *State v. Holt* (1997), 132 Ohio App.3d 601, 605, 725 N.E.2d 1155, 1158, citing *Illinois v. Perkins* (1990), 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243, and *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, *certiorari denied* (1996), 516 U.S. 1177, 116 S.Ct. 1275, 134 L.Ed.2d 221.

16. See *Miranda v. Arizona* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

17. See *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 336.

18. See *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279.

residential treatment center, Evans properly understood his freedom to have been curtailed to a degree greater even than that associated with an arrest. He could not go home, leave the grounds without permission, or move freely throughout the facility.

Nevertheless, there are a series of prison cases that require curtailment of freedom beyond that normally associated with imprisonment before the state has an obligation to issue *Miranda* warnings to prisoners.[19] But these cases primarily involve "bystanders" who only happen to be in custody. The presence of those prisoners makes a case analogous to an "on the scene" investigation, where police may freely question bystanders without issuing *Miranda* warnings. Evans was not a bystander. Nor was he sufficiently indoctrinated into life at Hillcrest to establish it as a normal environment for him. Indeed, the purpose of the indoctrination questioning was to admit a new, inexperienced resident. Under these circumstances, Evans was in custody for the purpose of *Miranda* warnings.

Next, we hold that the questions about other crimes that Evans was required to answer for his therapy met the definition of interrogation. Interrogation, under *Miranda*, "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[20] It is clear that requiring individuals in custody to write in detail about crimes for which they have never been adjudicated in court is not just likely to, but quite probably will, result in incriminating responses. This is express questioning.

By contrast, the statement Evans made in response to a casual inquiry from his residential treatment counselor while being transported to the hospital did not meet the definition of interrogation. There is nothing in the record to suggest that, by asking how Evans had managed to accumulate a lengthy record for someone so young, the residential treatment counselor sought to elicit incriminating statements. The counselor could not "be held accountable for the unforeseeable results of [her] words or actions."[21]

But Evans complains that he had already been required to divulge the same information in written form and would, the very next day, be required to present

---

19. See, generally, *State v. Holt* (1997), 132 Ohio App.3d 601, 725 N.E.2d 1155, fn. 2.

20. See *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297, 308; *State v. Tucker* (1998), 81 Ohio St.3d 431, 436, 692 N.E.2d 171, 175, citing *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph five of the syllabus, and *State v. Knuckles* (1992), 65 Ohio St.3d 494, 605 N.E.2d 54, paragraph two of the syllabus.

21. See *Rhode Island v. Innis* at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308.

his confession in a group setting. In his view, in the overall context of his residential experience, he was required to answer with nothing but complete candor. For purposes of this constitutional analysis, we are not prepared to accept the proposition that such a casual comment by the counselor was intended by subterfuge to elicit an incriminating response, especially when a confession had been obtained in writing by more direct methods on the previous day. There is also nothing in the record to indicate that the counselor knew the contents of the writing that Evans had submitted the day before.

Finally, we turn to the crucial issue of whether the custodial interrogation to which Evans was subjected was conducted by law enforcement officials or instigated by law enforcement officials and carried out by those acting as their agents. *Miranda* warnings are not required to be given by those who are not law enforcement officials or their agents.[22]

According to R.C. 2901.01(A)(11)(b), the definition of "law enforcement official" includes an employee of the state "upon whom, by statute, a duty to conserve the peace or to impose all or certain laws is imposed and the authority to arrest violators is conferred." Since Evans has not directed us to any statutory provision vesting the staff at Hillcrest with such authority (and we can find none), we can only conclude that staff members were not law enforcement officials under the Revised Code and were consequently not law enforcement officials for the purposes of *Miranda* warnings. We therefore join other Ohio courts that have similarly held that those tangentially associated with the criminal justice system, but without the requisite statutory authority, are not law enforcement officials for the purposes of *Miranda*.[23]

But this holding does not end the inquiry. If staff members at Hillcrest were acting as agents of law enforcement officials, they had a duty to give the *Miranda* warnings to Evans. Initially, it would appear that a United States Supreme Court decision based on similar facts would be dispositive of this case.

---

22. See *State v. Watson* (1971), 28 Ohio St.2d 15, 26, 57 O.O.2d 95, 101, 275 N.E.2d 153, 160.

23. See *State v. Ferrette* (1985), 18 Ohio St.3d 106, 108 109, 18 OBR 139, 141–142, 480 N.E.2d 399, 402 (security personnel for State Lottery Commission); *State v. Bolan* (1971), 27 Ohio St.2d 15, 18, 56 O.O.2d 8, 10, 271 N.E.2d 839, 842 (privately employed security guards with limited powers of detention); *State v. Stout* (1987), 42 Ohio App.3d 38, 40, 536 N.E.2d 42, 44 (volunteer supervisor of probation department's substance-abuse program); *Columbus v. Gibson* (Dec. 15, 1992), Franklin App. No. 92AP–570, unreported, 1992 WL 414469 (social worker); *State v. Simpson* (Feb. 21, 1992), Ross App. No. 1706, unreported, 1992 WL 37793 (social-services supervisor). But, see, *State v. Gallagher* (1974), 38 Ohio St.2d 291, 297, 67 O.O.2d 354, 357–358, 313 N.E.2d 396, 400, vacated on other grounds (1976), 425 U.S. 257, 96 S.Ct. 1438, 47 L.Ed.2d 722, reinstated (1976), 46 Ohio St.2d 225, 75 O.O.2d 280, 348 N.E.2d 336 (parole officer must give *Miranda* warnings to parolee).

In *Estelle v. Smith*,[24] Smith had been ordered by the trial court to undergo a routine psychiatric examination to ensure that he was competent to understand the charges against him and to assist in his defense. But the psychiatrist who conducted the examination went beyond testifying about the neutral and limited issue of the defendant's competency. The psychiatrist also testified for the prosecution, using the court-ordered examination as his basis, during the penalty phase of the trial. The court first held that, for purposes of the Fifth Amendment privilege against self-incrimination, there was no appreciable difference between the guilt and penalty phases of a criminal trial.[25] The court then noted that when the psychiatrist went "beyond simply reporting to the court on the issue of competence and testified for the prosecution, * * * his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting."[26] So the court concluded that Smith's statements "were not 'given freely and voluntarily without any compelling influences' and, as such, could be used * * * only if [Smith] had been apprised of his rights and had knowingly decided to waive them."[27]

But most courts from around the country that have interpreted this decision have concluded that some duty to report to law enforcement officials is required for one to be considered an agent. This is true regardless of whether a duty to report is imposed by statute[28]; whether it is based on organizational procedures and responsibilities[29]; or whether it is self-imposed by a desire to cooperate in the furtherance of an ongoing investigation.[30] In the absence of any duty to report, courts have generally agreed that the questioner is not acting as an agent of law enforcement officials.[31] We believe that the better rule requires a

---

**24.** (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359.

**25.** *Id.* at 462–463, 101 S.Ct. at 1872–1873, 68 L.Ed.2d at 368–369.

**26.** *Id.* at 467, 101 S.Ct. at 1875, 68 L.Ed.2d at 372.

**27.** *Id.* at 469, 101 S.Ct. at 1876, 68 L.Ed.2d at 373, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 725–726.

**28.** See *Kansas v. Benoit* (1995), 21 Kan.App.2d 184, 194, 898 P.2d 653, 661.

**29.** See *State v. Robledo* (Colo.1992), 832 P.2d 249, 251; *Commonwealth v. A Juvenile* (1988), 402 Mass. 275, 278, 521 N.E.2d 1368, 1370.

**30.** See *United States v. D.F.* (C.A.7, 1997), 115 F.3d 413, 420, fn. 10; *Commonwealth v. Chacko* (1983), 500 Pa. 571, 581, 459 A.2d 311, 315, fn. 3.

**31.** See *United States v. Morales* (C.A.2, 1987), 834 F.2d 35; *State v. Olson* (S.D.1989), 449 N.W.2d 251; *People v. Anderson* (1995), 209 Mich.App. 527, 534, 531 N.W.2d 780, 785. But,

duty to report to law enforcement officials, or at least a solicitation or recruitment by law enforcement, as a predicate for holding that a questioner is an agent for purposes of giving a suspect the *Miranda* warnings.

In this case, the record is not clear precisely why the staff at Hillcrest felt compelled to report Evans's statements to the police. There was no statutory duty (R.C. 2921.22[A] was not applicable because law enforcement officials were already aware that a felony had been committed[32]), nor is there any indication in the record that it was the policy of Hillcrest, or of juvenile court employees in general, to report the incriminating statements of juveniles in their care. There is also no evidence that the staff of Hillcrest had individually or collectively agreed to cooperate closely with the police to further ongoing criminal investigations in general or the Evans investigation in particular.

In the absence of a pattern of reported confessions, or some factual basis to believe that there was an individual agreement to further the police investigation of Evans specifically, we must conclude that Hillcrest staff members were not acting as agents for law enforcement officials. Under these circumstances, Evans was not entitled to receive *Miranda* warnings before he was required to write about and confess in a group setting to his culpability for unrelated crimes.

We pause before leaving this area of the law to address the single argument that the state has advanced in this appeal. The state contends that Evans's statements should not have been suppressed because he was not entitled to receive *Miranda* warnings. To so hold, the state urges us to reverse our decision in *State v. Holt*, where we held that a suspect is in custody for the purposes of the *Miranda* warnings even if the custody is for an offense unrelated to the offense that is being investigated.[33] But the rule stated by *Holt* is good law, and we decline to disturb it.

In *Holt*, the police questioned the defendant, who was in custody on another offense, about an unrelated murder. There, the similarity to the present case ends. We have independently determined that Evans was not entitled to receive *Miranda* warnings because his questioners were not law enforcement officials, nor were they acting as the agents of law enforcement officials. Thus, the state's single argument is largely irrelevant to this case.

---

see, *State v. Tibiatowski* (Minn.1999), 590 N.W.2d 305, 310 ("*Miranda* must be given by all those who use the power of the state to elicit an incriminating response from a suspect, regardless of whether they are law enforcement personnel").

**32.** See *In re Stichtenoth* (1980), 67 Ohio App.2d 108, 110, 21 O.O.3d 420, 421–422, 425 N.E.2d 957, 958–959.

**33.** See *State v. Holt*, supra, at 605, 725 N.E.2d at 1157 1158.

### B. The "Classic Penalty" Situation and Self–Incrimination

■ While there is no basis in the record to hold that Evans was entitled to receive *Miranda* warnings before he made any of his three confessions, two of the statements were still properly suppressed by the trial court, though for the wrong reason. By procuring two incriminating statements as a condition of court-ordered therapy and under threat of substantial penalty, Hillcrest placed Evans in the "classic penalty" situation. His privilege against self-incrimination therefore became self-executing, and the resulting confessions could not be used against him in a criminal trial.

The second exception to the general rule that the privilege against self-incrimination must be claimed is "where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, * * * and compe[l] * * * incriminating testimony.'" [34] An individual who succumbs to the pressure of the penalty threatened by the state, fails to assert the privilege against self-incrimination, and then makes an incriminating statement is excused from failing to assert the privilege when the state seeks to use the incriminating statement in a criminal prosecution.[35]

In *Minnesota v. Murphy*, a probationer argued that since revocation of his probation had been threatened if he was not truthful with his probation officer, he had been compelled to make incriminating disclosures instead of asserting his constitutional privilege against self-incrimination.[36] The United States Supreme Court ultimately concluded that there was no inherent threat in the requirement that Murphy be truthful with his probation officer.

First, the condition of Murphy's probation required only that he be truthful but "said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege." [37] Second, Murphy was not expressly warned "that an assertion of the privilege would result in the imposition of a penalty." [38] And, finally, it would have been unreasonable for Murphy to assume that an assertion of his privilege would result in a penalty, since the court's

---

34. See *Minnesota v. Murphy* (1984), 465 U.S. 420, 434, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409, 424, quoting *Garner v. United States* (1976), 424 U.S. 648, 661, 96 S.Ct. 1178, 1186, 47 L.Ed.2d 370, 382.

35. See *Garrity v. New Jersey* (1967), 385 U.S. 493, 498–499, 87 S.Ct. 616, 619–620, 17 L.Ed.2d 562, 566–567.

36. See *Minnesota v. Murphy* at 434, 104 S.Ct. at 1146, 79 L.Ed.2d at 423–424.

37. *Id.* at 437, 104 S.Ct. at 1147, 79 L.Ed.2d at 426.

38. *Id.* at 438, 104 S.Ct. at 1148, 79 L.Ed.2d at 426.

decisions "ha[d] made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." [39]

While the court held that Murphy had not been subjected to a state-threatened penalty, it also made clear what the result would have been had such a penalty in fact been reasonably perceived. "[I]f the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the *classic penalty situation*, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." [40]

The Supreme Court's holding in *Murphy* has been held by various courts to apply in the context of sexual-abuse treatment programs. It appears common that such programs require participants to divulge specific criminal acts to which they have not previously admitted, putatively for therapeutic reasons. We find these cases to be analogous to the dilemma faced by Evans and therefore instructive.

Where the participants in a state treatment program who failed to disclose prior criminal acts were threatened with parole violations,[41] transfer to a more restrictive facility,[42] or continued denial of access to their children,[43] courts have held that they were in the "classic penalty" situation in violation of their Fifth Amendment privilege. And some courts have held that it would be impermissible to require participants to "waive" their privilege against self-incrimination as a condition of probation.[44]

But other courts have had the occasion to define the limits of the "classic penalty" situation. Where (1) the treatment program has been deemed voluntary because it is a condition of initial parole eligibility, (2) the penalty is insubstantial because the resultant facility transfer is to another medium-security prison and therefore essentially lateral, and (3) the denial of parole does not automatically follow from a refusal to speak, then although the defendant's constitutional privilege has admittedly been burdened, the burden is held to be sufficiently

---

**39.** *Id.*

**40.** *Id.* at 435, 104 S.Ct. at 1146, 79 L.Ed.2d at 424–425 (emphasis ours).

**41.** See *Mace v. Amestoy* (D.Vt.1991), 765 F.Supp. 847, 851; *State v. Fuller* (1996), 276 Mont. 155, 166–167, 915 P.2d 809, 816; *State v. Kaquatosh* (Minn.App.1999), 600 N.W.2d 153, 158.

**42.** See *Lile v. McKune* (C.A.10, 2000), 224 F.3d 1175, 1189.

**43.** See *In re Amanda W.* (1997), 124 Ohio App.3d 136, 141, 705 N.E.2d 724, 727.

**44.** See *State v. Eccles* (1994), 179 Ariz. 226, 229, 877 P.2d 799, 802.

mitigated.[45] None of these factors that might have mitigated the burden on Evans's constitutional rights was present in this case.

First, Evans's participation in therapy at Hillcrest was not voluntary. It was ordered by the court. Second, rather than insubstantial, the penalty for Evans's failure to disclose his culpability in prior crimes was quite substantial. It began with a withholding of home visits as a further restriction on his freedom. It included a denial of access to other group activities. Ultimately, a failure to participate and to disclose was punishable by an adjudication of delinquency for the violation of a court order, the penalty for which included not a lateral facility transfer, but a transfer into the far more restrictive Department of Youth Services.

Finally, it was represented that the escalating series of penalties would have been automatically imposed. In fact, Evans had already been admonished and sanctioned for not thoroughly divulging the details of all of his previous transgressions. Evans had already been excluded from accumulating points towards home visits, since his first "commitment offense paper" had been deemed "incomplete." And, as further evidence of the potency of the Hillcrest regimen, no resident in the memory of the staff had ever failed to succumb to the consistent compulsion and threat of automatic penalties.

For these reasons, we hold that Evans's commitment to the court-ordered residential therapy at Hillcrest, which required him to admit his guilt in crimes for which he had not been adjudicated, placed Evans in the "classic penalty" situation contemplated by *Murphy*. Evans was unconstitutionally forced to choose between a substantial penalty and self-incrimination. Therefore, Evans was excused from failing to raise his privilege, and the written confession in the form of the commitment offense paper, and his subsequent oral presentation of that confession before the group, were both properly suppressed.

 But we also hold that the confession made to the residential treatment counselor while Evans was being transported to the hospital was not the result of a "classic penalty" situation. There was no explicit threat that induced Evans to engage in any dialogue at that time, much less to confess to a murder. Evans instead argues that the threat was implicit. He maintains that since the counselor who transported him to the hospital was the same counselor who had required that he rewrite his commitment offense paper in detail, and since that counselor and many others would eventually have seen what he had written, any further discussion on that issue was tainted. In essence, Evans argues that the "cat was out of the bag." While Evans's argument has some merit in general,

---

45. See *Ainsworth v. Risley* (C.A.1, 2001), 244 F.3d 209, 216.

Evans's testimony at the suppression hearing does not support his contention in this case.

Evans's argument is based on a similar theory that has best been explained by the United States Supreme Court. "[A]fter an accused has once let the cat out of the bag by confessing, * * * he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession may always be looked upon as fruit of the first." [46] So, since his first confession was tainted, Evans urges us to hold that the second confession was inadmissible as the "fruit of the poisonous tree."

But when a first confession is constitutionally tainted, a subsequent related confession is not automatically invalid. When a prior statement has been coerced, there are several factors that a court should examine to determine whether the taint of the first confession has adhered to a subsequent confession. "[T]he time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." [47]

Here, Evans was away from the Hillcrest environment on his way to receive medical treatment. And while the questioner was the same one who had previously required that Evans complete his paper in incriminating detail, the tone of the question, and the question itself, did not imply a threat for a failure to communicate. And even if we assume that Evans felt compelled to answer, he could have very easily answered the very general question without confessing to complicity in a murder.

Under these circumstances, to hold that the taint of the first confession extended to the subsequent conversational confession, we would have to infer that Evans answered because he was still intimidated. But Evans has never articulated precisely why he divulged the information in the car. If Evans himself is not sure, we should not assume the facts necessary for him to suppress his own apparently voluntary statement.

---

**46.** See *United States v. Bayer* (1947), 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660–1661, quoted by *Oregon v. Elstad* (1985), 470 U.S. 298, 311, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222, 233–234.

**47.** See *Oregon v. Elstad* (1985), 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222, 232–233, citing *Westover v. United States*, decided together with *Miranda v. Arizona* at 494, 86 S.Ct. at 1638, 16 L.Ed.2d at 734–735; *Clewis v. Texas* (1967), 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423.

## VI. Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty or property without due process of law." Confessions that have been coerced by the state and therefore have been involuntarily given have long been held to violate this guarantee of due process.[48]

In the 1960s, the United States Supreme Court changed the focus of analysis concerning the admissibility of a suspect's incriminating statements. The emphasis shifted away from a due-process analysis, as the court held that the Fifth Amendment's Self Incrimination Clause applied to the states as well as to the federal government.[49] But the court "never abandoned this due process jurisprudence, and thus continue[s] to exclude confessions that [have been] obtained involuntarily."[50] Thus a separate analysis of whether Evans's three statements were obtained involuntarily is appropriate. We hold that the two statements made in response to court-ordered therapy were involuntary. But Evans's casual conversation with his counselor was voluntary.

It was the prosecution's burden to prove by a preponderance of the evidence that Evans's three confessions were voluntary.[51] To determine whether a juvenile's confession is voluntary, the totality of the circumstances must be considered, including "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; and the existence of physical deprivation or inducement."[52] But we are not limited to these specific criteria in reviewing the totality of the circumstances in this case. We may further properly consider as a contributing factor whether Evans received *Miranda* warnings or was otherwise made aware of his constitutional rights.[53]

---

48. See *Miller v. Fenton* (1985), 474 U.S. 104, 109–110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 410–411.

49. See *Malloy v. Hogan* (1964), 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658.

50. See *Dickerson v. United States* (2000), 530 U.S. 428, 434, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405, 434.

51. See *State v. Hill* (1992), 64 Ohio St.3d 313, 318, 595 N.E.2d 884, 890, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, and *Lego v. Twomey* (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618.

52. See *In re Watson* (1989), 47 Ohio St.3d 86, 548 N.E.2d 210, citing *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus, vacated as to death penalty (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155.

53. See *Davis v. North Carolina* (1966), 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895, 897–898; *State v. Barker* (1978), 53 Ohio St.2d 135, 141, 7 O.O.3d 213, 216–217, 372 N.E.2d 1324, 1330, fn. 3.

And though Ohio juvenile law does not require that a parent or an interested adult be present for the questioning of a juvenile, such absence may also be considered in the totality of the circumstances.[54]

Ultimately, in reviewing the totality of the circumstances surrounding a confession, we must decide " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of [the] confession." [55] Put another way, "the determination 'depend[s] upon a weighing of the circumstances of pressure against the power of the resistance of the person confessing.' " [56] And the United States Supreme Court has noted that special care must be taken when evaluating the totality of the circumstances surrounding a juvenile's confession. Where the juvenile's counsel was not present for some permissible reason, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." [57]

Before we weigh the totality of circumstances under which Evans confessed, we must first determine whether state action was the catalyst for the confession. Since even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause," [58] at least some form of state action was required for Evans's statements to have been suppressed under the Fourteenth Amendment.

Initially, a narrow reading of selected sections of the Supreme Court's decision in *Colorado v. Connelly* might suggest that overreaching on the part of the police is the requisite standard. The court stated that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." [59] But that

---

54. See *State v. Bobo* (1989), 65 Ohio App.3d 685, 690, 585 N.E.2d 429, 432.

55. See *Dickerson v. United States* (2000), 530 U.S. 428, 434, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405, 413, quoting *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862.

56. See *Dickerson, supra,* quoting *Stein v. New York* (1953), 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522, 1542.

57. See *In re Gault* (1967), 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561.

58. See *Colorado v. Connelly* (1986), 479 U.S. 157, 166, 107 S.Ct. 515, 521, 93 L.Ed.2d 473, 483, citing *Walter v. United States* (1980), 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410, 417, *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 487–488, 91 S.Ct. 2022, 2048–2049, 29 L.Ed.2d 564, 595–596, and *Burdeau v. McDowell* (1921), 256 U.S. 465, 476, 41 S.Ct. 574, 576, 65 L.Ed. 1048, 1051.

59. See *Colorado v. Connelly, supra,* at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 484.

narrow and literal interpretation misunderstands the holding of the case.

The issue decided in *Connelly* was the absence or presence of *coercive* police conduct. Police were clearly the state actors in that case. In those circumstances, the emphasis of the court was on the absence or presence of coercive conduct, not on whether the conduct was the result of state action. Therefore, any perception that the due-process analysis related to involuntary confessions should be strictly limited to police conduct rests solely on dicta.

In fact, the court acknowledged a more expansive definition of state actors in other portions of the decision. Specifically, the court recognized that the flaw in the decision of the Colorado Supreme Court under review was a failure to "recognize the essential link between coercive activity *of the State*, on the one hand, and a resulting confession by a defendant, on the other." [60] Similarly, the court also noted that its " 'involuntary confession' jurisprudence [was] entirely consistent with the settled law requiring some sort of *'state action'* to support a claim of violation of the Due Process Clause of the Fourteenth Amendment." [61]

Turning then to the issue of whether Hillcrest's residential treatment counselors were state actors for the purposes of eliciting Evans's confessions, we initially observe that the inquiry here is broader than our earlier *Miranda* inquiry. For purposes of that inquiry, we have already concluded that the Hillcrest counselors were not law enforcement officials, nor were they acting as the agents of law enforcement officials. That analysis, however, was more limited than the present inquiry, which focuses more expansively on the exercise of state power in prompting Evans's confessions.

It is true that government employment alone is insufficient to qualify a questioner as a state actor for purposes of due-process analysis.[62] Something more is required, and it was present in this case. Not only were the Hillcrest counselors employees of the juvenile court, but it was also the juvenile court that required Evans to be committed to their care and to follow their mandates to disclose his prior crimes. Under these conditions, where Evans was committed by the power of the state and required to divulge his involvement in prior crimes by the power of the state, we hold that the questioners were state actors.

---

60. See *Connelly, supra*, at 165, 107 S.Ct. at 521, 93 L.Ed.2d at 483 (emphasis added).

61. *Id.* (emphasis added).

62. See *United States v. D.F.* (E.D.Wis.1994), 857 F.Supp. 1311, 1325–1326, affirmed (C.A.7, 1995), 63 F.3d 671, remanded for reconsideration (1996), 517 U.S. 1231, 116 S.Ct. 1872, 135 L.Ed.2d 169, affirmed (C.A.7, 1997), 115 F.3d 413; *In re Timothy C.* (Ariz.App.1999), 194 Ariz. 159, 162–163, 978 P.2d 644, 647–648; *State v. Bright* (Del.Super.Ct.1996), 683 A.2d 1055, 1060.

■ Having held that Evans's questioners were state actors, we next evaluate the totality of the circumstances surrounding his confessions to determine whether they were made voluntarily. We hold that the two confessions induced by court order were involuntary, but that his response to the counselor's inquiry into how he had managed to accumulate an extensive record was voluntary.

We begin by recounting those circumstances common to all three of Evans's confessions. Evans was fifteen years old at the time and was purported to have had an IQ of 75. But he also had an extensive record and more than a passing familiarity with the juvenile court system. He knew that he could, under certain circumstances, invoke his right against self-incrimination because he had invoked that very right when initially questioned by the police about his involvement in the aggravated assault. We cannot, however, impute to Evans the sophistication to understand that his constitutional rights were also applicable in the context of court-ordered therapy, especially when the juvenile court counselors seemed to have been similarly unknowledgeable.

In any event, Evans received no instructions about his constitutional rights. Evans also did not have a parent or an interested adult present during the questioning. In fact, those adults who were expected to work with Evans for his benefit and sought to establish a trusting relationship with him were the very adults who ultimately divulged what he had told them. There is no doubt that Evans was isolated from any adult whose main priority was protecting Evans's interests.

We now review the unique characteristics that distinguish Evans's two court-ordered interrogations, on the one hand, from the casual conversation with his counselor on the other. What is remarkable about the court-ordered interrogation to which Evans was subjected is not its intensity or relative harshness, but rather its grinding duration and inevitability. Evans was warned when he arrived at Hillcrest that he must divulge incriminating information. It was not a question of whether Hillcrest would get the information; it was only a question of when Evans would succumb, as had all those who had preceded him. Hillcrest counselors institutionally and effectively employed both inducements and threats to insure that Evans would eventually give them what they wanted and thereby incriminate himself. While we find no fault with Hillcrest's procedures for purposes of therapy, our inquiry is far different when considering information obtained as a result.

Under these circumstances, we hold that Evans's will was overborne by the surrounding circumstances and that the unrelenting state pressure to confess outweighed his power to resist. Both Evans's "commitment offense paper" and his subsequent oral presentation of the paper were involuntary and coerced. The

statements therein were the product of ignorance of his rights and despair. These statements were properly suppressed.

■ By contrast, Evans's incriminating response to how he had managed to get into so much trouble at such a young age appears to have been voluntary. There is no indication in the record that Evans believed a failure to respond in that setting would have been punished. There is no grinding inevitability to the questioning. It appears as though Evans understandably responded in an attempt to establish a better working relationship with his counselor. While we are not altogether comfortable with such a potentially cynical use of the putatively therapeutic relationship, Evans's response must be considered voluntary for purposes of due process because there was no explicit or reasonably implicit threat compelling him to respond.

### VII. Conclusion

Thus, we hold that both Evans's "commitment offense paper" and the subsequent oral presentation of the paper were properly suppressed even though Evans was not entitled to receive *Miranda* warnings. The extraction of those two confessions was repugnant to both the Ohio and the United States Constitutions' privilege against self-incrimination as well as the Fourteenth Amendment's due-process guarantee. We therefore affirm the trial court's decision to suppress the evidence relating to the paper and the group presentation, though on different grounds from those stated by the trial court.

But we reverse the trial court's decision to suppress Evans's voluntary response to his counselor's general inquiry. While there were some unsettling aspects to the overall context in which that statement was made, none of these aspects gave rise to a constitutional violation. We remand this case to the trial court for further proceedings in accordance with the terms of this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

DOAN, P.J., concurs.

WINKLER, J., concurs in part and otherwise concurs in judgment only.

WINKLER, Judge, concurring in part and otherwise concurring in judgment only.

I agree that the trial court should not have suppressed Evans's voluntary response to his counselor during their trip to the hospital. And I agree that the

trial court properly suppressed Evans's written statement and his oral statement made during the group presentation.

But, I write separately to emphasize that I do not concur in Part IV, in which the lead opinion *sua sponte* raises issues of possible statutory violations that are not even cognizable in a motion to suppress. The Supreme Court of Ohio has consistently refused to apply the exclusionary rule to evidence obtained through conduct that is violative of state law but not violative of constitutional rights. See, *e.g., State v. Jones* (2000), 88 Ohio St.3d 430, 435, 727 N.E.2d 886, 891. The lead opinion's foray into *obiter dictum* simply ignores the admonition of App.R. 12(A)(1)(b), which instructs this court to "[d]etermine the appeal on its merits on the assignments of error set forth in the briefs." To that end, I fail to see how the lead opinion can accurately depict the state's sole assignment of error as "largely irrelevant," given that the state attacks the very grounds upon which the trial court's judgment was made.

Finally, I refuse to join in the vitriolic tone employed by the lead opinion in its discussion of the treatment methods used at the Hillcrest School. In essence, the lead opinion portrays the school personnel as something akin to Hitler's Gestapo in that their "interrogation" tactics were of "grinding duration and inevitability" leading to Evans's "despair" and written admission. My reading of the record indicates that such portrayals by the lead opinion are not only unwarranted but are gross exaggerations of the facts presented to the trial court.