TUCKER, J., concurring:
{¶ 35} I agree with the majority opinion that Stephens was not entitled to Miranda warnings and that his right against self-incrimination was not otherwise violated. I write separately to discuss the classic penalty situation and why, given the record before us, it does not require suppression of Stephens' statements.
{¶ 36} The Fifth Amendment states, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself." The prohibition against compelled self-incrimination allows a person "not to answer official questions put to him in any * * * proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Lefkowitz v. Turley , 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). An individual subject to such self-incrimination may refuse to answer questions and may continue such refusal until his answers are protected from use against him in any future criminal case in which he is a defendant. If the person is compelled to answer without such protection, his answers may not be used against him in a later criminal case. Lefkowitz v. Turley , at 78, 94 S.Ct. at 322.
{¶ 37} In most circumstances an individual must assert the privilege or it is lost. The failure to assert the privilege is often referred to as a waiver, but the Supreme Court has commented that a person who fails to assert the privilege may be deprived of its "benefit... without making a knowing and intelligent waiver." Minnesota v. Murphy , 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), quoting *633 Garner v. United States , 424 U.S. 648, 654, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976), fn.9. In short, "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." Minnesota v. Murphy , at 427, 104 S.Ct. at 1142, quoting Garner v. United States at 654, 96 S.Ct. at 1182.
{¶ 38} This being said, there are certain situations where the self-incrimination privilege is triggered in the absence of its invocation. These situations occur when a person is deprived of a "free choice to admit, to deny, or to refuse to answer." Garner v. U.S. , at 657, 96 S.Ct. 1178, quoting Lisenba v. California , 314 U.S. 219, 241, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Custodial interrogation is the best known example of the privilege being triggered without its invocation being required, with the Miranda decision requiring suppression of a defendant's custodial statements unless the defendant has been advised, among other things, of his right against self-incrimination, the consequences of the failure to assert the privilege, and the defendant's knowing and voluntary waiver of the right against self-incrimination. Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
{¶ 39} A second circumstance where the right against self-incrimination is self-executing is the so called classic penalty scenario. Garrity v. New Jersey , 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Garrity involved a situation where Garrity, a police officer, was asked investigative questions about a traffic ticket fixing scheme. Garrity was informed that if he did not answer the questions his employment would be terminated. Garrity was further informed that if he answered the questions his responses could be used against him in a future criminal prosecution.
{¶ 40} Garrity, having been placed between the indicated "rock and a hard place," answered the inquiries. Garrity's answers were then used against him in a subsequent prosecution for conspiracy. The Supreme Court ruled that in the context of "threat[s] of removal from office" the act of responding to interrogation was not voluntary. Garrity at 500, 87 S.Ct. 616. Garrity, that is, was compelled to be a witness against himself, and, thus, his statements, though he did not invoke his right against self-incrimination, could not be used against him in any criminal prosecution involving the traffic ticket fixing scheme.
{¶ 41} In Minnesota v. Murphy , the Supreme Court concluded, despite a probationer's requirement to meet with and be truthful with his probation officer or face revocation, that Murphy's admissions to his probation officer about criminal conduct unrelated to his probation status were not suppressible in a subsequent criminal prosecution based upon a classic penalty rationale. The court indicated that the inquiry was "whether Murphy's probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went farther and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." Minnesota v. Murphy at 436, 104 S.Ct. at 1147. The Court concluded that "Minnesota did not attempt to take the extra, impermissible, step," and, as such, "Murphy's Fifth Amendment privilege was not self-executing." Id.
{¶ 42} The Court, in reaching this conclusion, noted that it had not been advised of any situation in which Minnesota "attempted to revoke probation merely because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct; and, in light of our decisions *634 proscribing threats or penalties for the exercise of Fifth Amendment rights, Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation." Id. at 439, 104 S.Ct. at 1148. The Court, in summary, concluded that Murphy was not "deterred from claiming the privilege by a reasonably perceived threat of revocation." Id.
{¶ 43} The Murphy Court, before reaching the discussed conclusion, did state "[t]here is... a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." Id. at 435, 104 S.Ct. at 1146.
{¶ 44} This gets us to State v. Evans , 144 Ohio App.3d 539, 760 N.E.2d 909 (1st Dist. 2001), which Stephens asserts supports a suppression conclusion in his case. The Evans court, using a classic penalty analysis, suppressed statements Evans, a juvenile offender, made during the course of court ordered treatment.
{¶ 45} Evans, when he was fifteen, was charged with assault, with the charge ultimately being dismissed because the victim died and Evans could not otherwise be identified as the attacker. Evans, thereafter, was adjudicated delinquent for an unrelated assault offense. The juvenile court ordered that Evans be confined at, and receive treatment from, a residential treatment center.
{¶ 46} Evans, without dispute, was required to engage in therapy. Evans' failure to do so would have resulted in an inability to engage in group activities, cancellation of weekend home visits, and, ultimately, a transfer to a significantly more restrictive juvenile facility. The record indicated that while some residents were initially resistant to the therapy, "all juvenile residents eventually succumbed to the pressure and participated." Evans at 547, 760 N.E.2d at 915.
{¶ 47} Evans, as part of his indoctrination into therapy, was required to complete what was referred to as a "commitment offense paper," which required Evans to describe "all the crimes he had committed" whether they related to his current juvenile detention or not. Id. It seems that in the typical case, the "commitment offense paper" instructions included a statement that the recounting of unrelated offenses was for therapeutic, not prosecutorial, purposes. This statement, for unexplained reasons, was not included in the instructions provided Evans and no one informed him of his right against self-incrimination.
{¶ 48} Evans' initial attempt to complete the "commitment offense paper" was found deficient because it was not a sufficient recounting of his past criminal conduct. A counselor, in an attempt to assist Evans, gave him a list of past charges he had faced which included the assault which had evolved into a murder. Evans was specifically instructed to provide the details of each charge.
{¶ 49} Evans complied and what he wrote about the assault/murder was "essentially a confession to murder." Evans at 547, 760 N.E.2d at 916. Evans, thereafter and as a required condition of the program, made an oral confession to the murder during a group therapy session.
{¶ 50} A residential treatment supervisor, a week or so later, became aware of Evans' confession. It was ultimately decided that the confession should be reported to the police. Not surprisingly, a murder indictment followed soon thereafter.
*635 {¶ 51} The First District ruled that Evans' confession contained in the "commitment offense paper" and the oral confession made during the group therapy session were subject to suppression under a classic penalty analysis. The court, it is noted, rejected an argument that Miranda warnings were required. The court further allowed a third confession that did not implicate Evans' court ordered therapy. The rationale for the suppression conclusion was based upon three factors: (1) Evans' therapy participation was not voluntary; (2) the penalties Evans faced if he failed to participate were significant; and (3) the penalties, imposed in an escalating fashion, were automatic. The court, based upon these reasons, held that "Evans was unconstitutionally forced to choose between a substantial penalty and self-incrimination." Id. at 558, 760 N.E.2d at 924. Evans, accordingly, was "excused from failing to raise his privilege... " Id.
{¶ 52} The present situation, assuming Evans was correctly decided, is distinguishable. Stephens' treatment plan did call for him to admit past uncharged conduct, the treatment plan manual (Hrg. Ex. 2) did mention the prospect of a polygraph examination to monitor truthfulness, and successful completion of the Talbert House program was a condition of Stephens' judicial release. However, Stephens, in contrast to Evans, was informed that an admission regarding a child would be reported to the police. Further, the treatment plan manual informed treatment participants that "there are certain circumstances in which your counselor is required to report offenses. You need to understand these circumstances." Hrg. Ex. 2, pg.17. Treatment participants were also told that if there was a "fear" about being "re-arrested", "talk to your counselor... [and] [a]sk for clarification of the confidentiality law." Id. There is nothing in the record to suggest that if Stephens had sought confidentiality clarification that he would have been compelled to report past sexual offenses or face a treatment failure conclusion, expulsion from Talbert House and judicial release revocation.
{¶ 53} Stephens was not pressed to admit past offenses. Peterson, in fact, was quite surprised by Stephens' admissions. Additionally, Peterson testified that Stephens faced adverse program consequences only if he was not forthcoming about the offense that led to his Talbert House commitment.
{¶ 54} The record simply does not support a conclusion that Stephens was forced to make a choice between making incriminating statements about past uncharged conduct or jeopardizing his judicial release status by remaining silent. Since Stephens was not forced to make such a choice, a classic penalty situation was not created, and Stephens' privilege against self-incrimination did not become self-executing. The trial court, under a classic penalty analysis, correctly overruled Stephens' motion to suppress.