[Cite as *State v. Stephens*, 2017-Ohio-9230.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27235 |
| | : | |
| v. | : | T.C. NO. 15-CR-3053 |
| | : | |
| JOHN K. STEPHENS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 22nd day of December, 2017.

. . . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. No. 0067020 and NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 130 W. Second Street, Suite 2150, P. O. Box 10126, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

        {¶ 1} Defendant-appellant John K. Stephens appeals his conviction and sentence

for three counts of rape (less than ten years of age), in violation of R.C. 2907.02(A)(1)(b),

all felonies of the first degree. Stephens filed a timely notice of appeal with this Court on August 25, 2016.

{¶ 2} After violating the terms of his probation in Case No. 2013 CR 3550, Stephens was sentenced to prison for thirty-six months. On May 7, 2015, the trial court issued an entry granting Stephens judicial release. One of the conditions of his judicial release required Stephens to become a resident of Talbert House, a locked-down and secured rehabilitation facility where defendants receive sex offender therapy. Stephens was required to complete the sexual offender program at Talbert House. If he failed to complete the program, Stephens would be sent back to prison.

{¶ 3} Although the record is unclear regarding the specific dates, Stephens was allowed to participate in the sexual offender program at Talbert House once before in 2013 or 2014 in Case No. 2013 CR 3550, but was discharged before completing the program because of a probation violation. Thus, we note that the instant case represents the second time that the trial court permitted Stephens to participate in the sexual offender program at Talbert House.

{¶ 4} Upon arriving at Talbert House on May 14, 2015, Stephens was processed as an incoming resident by administrative specialist Patricia Stanley. Stanley testified that she was familiar with Stephens because he had been placed in the program once before and indicated that this was the second occasion upon which she had "briefed him for intake." Part of the briefing packet Stanley provided Stephens with included State's Exhibit I, the confidentiality form, which stated in pertinent part:

Federal Laws and Regulations do not protect information about suspected

child abuse or neglect from being reported under State Law to appropriate

State or Local authorities.

After Stanley explained and reviewed the confidentiality form with Stephens, she watched him sign the document.

{¶ 5} Once admitted, Stephens was required to participate in sexual offender treatment at Talbert House. To facilitate his treatment, Stephens was assigned to a small group which met three times a week for two hours each session. Stephens' group was moderated by Sherry Peterson, a clinical service provider for the sexual offenders at Talbert House in 2015. When beginning treatment, Peterson testified that she always initially reviews the confidentiality form with her "clients" and explains that she is a mandated reporter with a legal duty to warn, and if anyone tells her that they have caused harm to a child or elder, is going to cause harm to a child or elder, or cause harm to themselves, she has a duty to report that information to the police. Peterson further testified that due to the serious nature of their charges, she always specifically explains to sexual offender groups that "if they tell me that they've committed an [previously undisclosed] offense on a child or elder" confidentiality may be breached.

{¶ 6} Stephens had been placed in sexual offender treatment for an offense involving only one victim. However, on June 2, 2015, as part of a work assignment for Peterson's group treatment class, Stephens turned in five index cards, each containing the initials of a different victim. Peterson testified that she was surprised by Stephens' actions because in her experience, she never had a "client" admit to previously undisclosed victims as part of the assignment. Peterson further testified that she assumed Stephens would only want to discuss the victim and offense for which he had been convicted. Peterson testified that during the group meetings she tries not to guide

her "clients" regarding what they want to talk about. In fact, Peterson testified that she never told Stephens that he had to provide any names or initials as part of the assignment. After Stephens turned in the index cards, the only question Peterson asked him was "do the people know about these right here?" to which Stephens responded in the negative. Peterson asked no additional questions regarding the previously undisclosed victims during the group meeting. We note that Peterson testified that there was only one other "client" for the group meeting held that day. Peterson testified that because of her duty to report, she immediately went to Linda Stout, her supervisor, for her guidance on what steps to take in light of Stephens' admissions.

{¶ 7} As an additional component of the sexual offender treatment, Peterson instructed her "clients" to keep a journal of their thoughts and feelings. Peterson testified that she did not tell her "clients" what to write in the journal, and Stephens did not write in his journal during class. Peterson testified that the "clients" were aware that she was going to review their journal entries. On June 4, 2015, Stephens submitted his journal to Peterson. In his journal, Stephens disclosed additional initials, which he had not listed on the index cards submitted to Peterson on June 2, 2015. Peterson brought the additional initials to Stout's attention, and on June 4, 2015, Stout contacted the Talbert House legal department, otherwise known as QCS. QCS directed Stout to contact the police. Stout contacted Lieutenant Cavanaugh from the Kettering Police Department. Lt. Cavanaugh then contacted Detective Gary Schomburg who had previously investigated Stephens' underlying conviction in Case No. 2013 CR 3550 for gross sexual imposition. Det. Schomburg spoke with Stout on June 4, 2015, and she informed him that Stephens had potentially disclosed additional sex offense victims in his journal and

on index cards during his treatment at Talbert House. Det. Schomburg directed Stout to send him copies of the relevant documents but did not ask her to obtain any additional information from Stephens regarding his admissions. Stout then contacted QCS in order to confirm it was acceptable to transfer the documents to Det. Schomburg. QCS instructed Stout to send copies of the documents to Det. Schomburg. QCS also instructed Stout to inform Stephens that the documents were being disclosed to the police.

{¶ 8} On June 5, 2015, Stout contacted Schomburg via telephone and informed him that she could provide the documentation to him. The documents were later transmitted via fax to Det. Schomburg. After speaking with Det. Schomburg, Stout and Peterson had a meeting with Stephens in Stout's office. At the beginning of the meeting, Stout reviewed the Talbert House confidentiality agreement with Stephens. Stephens acknowledged that he first reviewed the agreement when he was processed into the program, and again when he initially met with Peterson when his treatment began. Stephens also acknowledged that he had signed the confidentiality agreement. Stout also reiterated that she and Peterson were mandatory reporters who were legally required to report sex abuse of a child to the police. Therefore, Stout informed Stephens that she was required to report to the police the additional victims he had disclosed during his treatment at Talbert House.

{¶ 9} At that point, Stephens indicated that there was one less victim than the number that Stout had indicated. Stephens stated that the initials I.A. and B.A. on the index cards were the same person, and he listed her initials twice because he "offended on her twice." Stout asked Stephens if he had anything else to tell them, and he

disclosed the full name of another child that he had abused. Stout testified that Stephens informed her that he felt relieved for having disclosed the additional sex offenses. However, when Stephens reviewed the initials R.R. which he had disclosed, he became upset and requested an attorney. At that point, the meeting was concluded, and Stout made arrangements for Stephens to retain counsel.

{¶ 10} After the meeting, Stout contacted Det. Schomburg to verify that he had received the faxed documents. Stout informed Det. Schomburg of the actual names of the additional victims that Stephens provided during the earlier meeting. Stout also informed Det. Schomburg that Stephens had requested that an attorney be present during any questioning by the police.

{¶ 11} On October 8, 2015, Stephens was indicted for three counts of rape of a child under ten years of age. At his arraignment on October 15, 2015, Stephens pled not guilty to the charges in the indictment. Shortly thereafter, Stephens filed a motion to suppress on October 28, 2015.[1] Stephens amended and supplemented his motion to suppress on November 4, 2015, and December 14, 2015. A hearing was held on said motion on February 4, 2016, after which, both parties were permitted to file post-hearing memoranda in support of their respective positions. In a decision issued on March 14, 2016, the trial court overruled Stephens' motion to suppress in its entirety.

{¶ 12} On July 22, 2016, Stephens entered a plea of no contest to each count in the indictment. On August 12, 2016, Stephens was sentenced to a mandatory term of fifteen years to life in prison on each count, the sentences to run concurrently.

---

[1] A portion of Stephens' motion related to the suppression of a search warrant issued in the instant case. On appeal, however, Stephens does not challenge the trial court's denial of his motion to suppress as it pertained to the search warrant.

{¶ **13**} It is from this judgment that Stephens now appeals.

{¶ **14**} Stephens' sole assignment of error is as follows:

{¶ **15**} "THE CONSTITUTIONAL RIGHTS OF JOHN STEPHENS WERE VIOLATED WHEN HE WAS COMPELLED TO MAKE INCRIMINATING STATEMENTS BY HIS COURT-ORDERED TREATMENT PROVIDER, IN VIOLATION OF PROGRAM POLICIES, WHICH WERE LATER USED TO INDICT MR. STEPHENS."

{¶ **16**} In his sole assignment, Stephens contends that the trial court erred when it overruled his motion to suppress the disclosures he made to Talbert House staff regarding the additional minor victims that he sexually abused. Specifically, Stephens argues that he was coerced by Talbert House staff into making incriminating statements without being first advised of his *Miranda* rights.

{¶ **17**} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley,* 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592, 639 N.E.2d 498. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ **18**} "The right to [*Miranda*] warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination." *State v. Strozier,* 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.), citing *Moran v. Burbine,* 475 U.S. 412,

420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "The procedural safeguards prescribed by *Miranda* apply only when persons are subjected to 'custodial interrogation.' " *State v. Thomas,* 2d Dist. Montgomery No. 20643, 2005-Ohio-3064, ¶ 27, citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 19} *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

{¶ 20} "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27, citing *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Therefore, "the test for custody is an objective test." *State v. Chenoweth,* 2d Dist. Miami No. 2010 CA 14, 2011-Ohio-1276, ¶ 8, citing *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). "The subjective views of the interviewing officer and the suspect are immaterial to the determination of whether a custodial interrogation was conducted." (Citations omitted.) *State v. Earnest,* 2d Dist.

Montgomery No. 26646, 2015-Ohio-3913, ¶ 22. *Accord State v. Gray,* 2d Dist. Montgomery No. 26139, 2016-Ohio-1419, ¶ 74.

{¶ 21} On appeal, Stephens argues that the trial court erred when it denied his motion to suppress because when he revealed information regarding the previously undisclosed victims, he did so under threat of being sent back to prison. Stephens further argues that he was in custody for the purposes of *Miranda*, and therefore, he should have been informed of his constitutional rights before being questioned by Peterson and Stout. Additionally, Stephens contends that Peterson and Stout were acting as agents of law enforcement when they questioned him about the undisclosed victims.

{¶ 22} In support of his arguments, Stephens relies on a case from the First District Court of Appeals, *State v. Evans*, 144 Ohio App.3d 539, 760 N.E.2d 909 (1st Dist.2001), where it was held that some of the statements disclosed to counselors by a juvenile, who was under involuntary commitment for treatment, were not admissible against the juvenile. In *Evans,* the court noted that the "classic penalty situation" contemplated in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), often arises in the context of sexual abuse treatment programs where participants are required to divulge specific criminal acts "putatively for therapeutic reasons." *Id.* at 557. The court also reasoned that Evans' participation in the program was not voluntary and the penalty for his failure to participate was substantial because it would result in a penalty for violating a court order. *Id.* at 558. Thus, according to the court, "Evans was unconstitutionally forced to choose between a substantial penalty and self-incrimination." *Id.* The facts in the instant case are distinguishable from those presented

in *Evans*.

{¶ 23} As explained in *Evans* at 557–558, 760 N.E.2d 909, there are three issues that define the limits of a "classic penalty" situation:

But other courts have had the occasion to define the limits of the "classic penalty" situation. Where (1) the treatment program has been deemed voluntary because it is a condition of initial parole eligibility, (2) the penalty is insubstantial because the resultant facility transfer is to another medium-security prison and therefore essentially lateral, and (3) the denial of parole does not automatically follow from a refusal to speak, then although the defendant's constitutional privilege has admittedly been burdened, the burden is held to be sufficiently mitigated.

{¶ 24} In *State v. Barker*, 5th Dist. Richland No. 16CA49, 2017-Ohio-596, the court stated as follows:

Imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda. Howes v. Fields*, 132 S.Ct. 1181, 1190, 182 L.Ed.2d 17 (2012). When a prisoner is questioned, the determination of whether the prisoner is in custody should focus on all of the features of the interrogation. *Id.* at 1192. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. *Id.* An inmate who is removed from the general prison population for questioning and is subjected to treatment in connection with the interrogation "that renders him 'in custody' for practical purposes ... will be entitled to the full panoply of protections prescribed by

*Miranda.*" *Id.*

*Id.* at ¶ 11.

**{¶ 25}** In the instant case, Stephens requested, and was granted, judicial release from prison for his conviction in Case No. 2013 CR 3550. Successful completion of judicial release meant that Stephens agreed to participate in sex offender treatment. While we note that Talbert House is a lock-down facility and "clients" were not free to leave, it was Stephens' choice to attend the sessions, and a decision not to attend or participate would not increase his original sentence. During the sessions, he was free to discuss his previous sex offenses, or not. Significantly, Peterson testified that although Stephens was expected to provide information regarding his underlying conviction, he was neither expected nor encouraged to provide any information regarding previously undisclosed offenses. Peterson did not directly or indirectly ask Stephens to provide information with respect to uncharged offenses in the exercise with the index cards or the personal journal he created. Stephens was not coerced into participation in the index card and journal exercise at Talbert House, and what he wanted to disclose during the treatment sessions was entirely at his discretion. On this record, Stephens' decision to disclose the additional victims was a voluntary one and not the product of coercion by Peterson or Stout. Therefore, we find that the record establishes that Stephens was not in custody for the purposes of *Miranda*.

**{¶ 26}** Additionally, neither Peterson nor Stout were law enforcement officers such that they were required to provide Stephens with *Miranda* warnings. Both Peterson and Stout were employees of Talbert House, not law enforcement officers. Generally, questioning by law enforcement is required to trigger the necessity for *Miranda* warnings.

On the other hand, the United States Supreme Court has recognized the applicability of *Miranda* in situations not involving law enforcement. The "duty of giving '*Miranda* warnings' is limited to employees of governmental agencies whose function is to enforce law, or to those acting for such law enforcement agencies by direction of the agencies; it does not include private citizens not directed or controlled by a law enforcement agency, *even though their efforts might aid in law enforcement*." *State v. Bolan*, 27 Ohio St.2d 15, 18, 271 N.E.2d 839 (1971). (Emphasis added).

{¶ 27} In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), syllabus, the U.S. Supreme Court held that a psychiatrist, who performed an involuntary evaluation of the defendant, could not testify regarding information that had been gathered by questioning during the evaluation, because the defendant had not been apprised of his Fifth Amendment rights. The examining physician was not a law enforcement officer, but the Court held that the doctor went beyond a routine examination and gathered information during the evaluation to testify concerning the defendant's future dangerousness and to assist the prosecution in seeking the death penalty. "[T]hose tangentially associated with the criminal justice system, but without the requisite statutory authority, are not law enforcement officials for the purposes of *Miranda*." *Evans* at 553.

{¶ 28} Here, neither Peterson nor Stout were acting as agents of law enforcement officials when they collected and eventually reported Stephens' admissions regarding the undisclosed victims. Unlike the treatment counselors in *Evans* who were employees of the juvenile court, Peterson and Stout were at all pertinent times employees of Talbert House. While it is undisputed that Peterson and Stout both had a duty to report any

previously undisclosed sex offenses against children, this fact, standing alone, did not render them state actors for the purposes of *Miranda*. Significantly, Stephens was already on notice that Peterson and Stout were mandatory reporters prior to disclosing the additional victims. Therefore, once they became aware that Stephens had committed sexual offenses against several previously undisclosed victims, Peterson and Stout had a legal obligation to inform the proper authorities. Before Stephens' admissions came to light, Peterson and Stout worked with him for treatment purposes only. At no time was Stephens under any compulsion or threat from Peterson or Stout to make any admissions regarding the undisclosed victims. There is no evidence that Stephens was threatened with punishment for failure to admit uncharged offenses or that he was even initially questioned with respect to anything other than his involvement in the underlying offense. There is also no evidence that Peterson or Stout originally suspected that Stephens committed additional crimes and were seeking to obtain his confession.

{¶ 29} Furthermore, the meeting on June 5, 2015, attended by Stephens, Peterson, and Stout was only held to inform Stephens that they had a mandatory duty to report his disclosures to the police. The record establishes that the purpose of the meeting was not to interrogate Stephens or coerce him into providing additional admissions. Specifically, Stout began the meeting by reviewing the confidentiality agreement and the duty to report. Stephens acknowledged that he reviewed the confidentiality agreement. Stout testified that Stephens inquired as to why she had to report the undisclosed victims to the police. Stout testified that she showed Stephens the index cards and the journal and stated that he had admitted to abusing a number of

previously undisclosed victims. Without encouragement of any kind, Stephens immediately corrected Stout as to the number of victims and stated that B.A. and I.A. were the same victim, and provided the child's full name and nickname. Stout then asked Stephens if there was anything else he wanted to tell them, and he provided the full name of another previously undisclosed victim. It was only when he acknowledged the initials R.R. that he became upset and asked for an attorney. At that point, Stout terminated the meeting.

{¶ 30} Upon review, we find that the record establishes that at no time was Stephens directed by Stout or Peterson to provide the full names of his additional victims. Stephens even testified that he was never asked to provide specific names. Rather, the record establishes that he provided some of the undisclosed victims' names on his own when he interrupted Stout during the meeting. Accordingly, we find that Stephens was not subject to an interrogation at the meeting on June 5, 2015, and he was therefore, not entitled to be informed of his *Miranda* rights.

{¶ 31} Lastly, Stephens argues that all of his statements and written admissions were involuntary and violated the Due Process clause of the United States Constitution. "The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no person shall be 'deprived of life, liberty or property without due process of law.' Confessions that have been coerced by the state and therefore have been involuntarily given have long been held to violate this guarantee of due process." *Evans* at 560, 760 N.E.2d 909.

{¶ 32} In light of the foregoing analysis, we agree with the trial court and find that neither Stout nor Peterson were acting on behalf of the police when Stephens disclosed

the initials and names of the additional child victims. Therefore, *Miranda* did not apply. Additionally, we find that Stephens was on notice prior to beginning his treatment that Stout and Peterson had a duty to report any previously undisclosed sex offenses against children to the police. Yet after being warned, Stephens still disclosed the initials and names of several additional victims. Therefore, we find that the trial court did not err when it denied Stephens' motion to suppress.

{¶ 33} Stephens' sole assignment of error is overruled.

{¶ 34} Stephens' sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, P.J., concurs.

TUCKER, J., concurring:

{¶ 35} I agree with the majority opinion that Stephens was not entitled to *Miranda* warnings and that his right against self-incrimination was not otherwise violated. I write separately to discuss the classic penalty situation and why, given the record before us, it does not require suppression of Stephens' statements.

{¶ 36} The Fifth Amendment states, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself." The prohibition against compelled self-incrimination allows a person "not to answer official questions put to him in any *** proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). An individual subject to such self-incrimination may refuse to answer questions and may continue such refusal until his answers are protected

from use against him in any future criminal case in which he is a defendant. If the person is compelled to answer without such protection, his answers may not be used against him in a later criminal case. *Lefkowitz v. Turley*, at 78, 94 S.Ct. at 322.

{¶ 37} In most circumstances an individual must assert the privilege or it is lost. The failure to assert the privilege is often referred to as a waiver, but the Supreme Court has commented that a person who fails to assert the privilege may be deprived of its "benefit… without making a knowing and intelligent waiver." *Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), quoting *Garner v. United States*, 424 U.S. 648, 654, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976), fn.9. In short, "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Minnesota v. Murphy*, at 427, 104 S.Ct. at 1142, quoting *Garner v. United States* at 654, 96 S.Ct. at 1182.

{¶ 38} This being said, there are certain situations where the self-incrimination privilege is triggered in the absence of its invocation. These situations occur when a person is deprived of a "free choice to admit, to deny, or to refuse to answer." *Garner v. U.S.*, at 657, quoting *Lisenba v. California*, 314 U.S. 219, 241, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Custodial interrogation is the best known example of the privilege being triggered without its invocation being required, with the *Miranda* decision requiring suppression of a defendant's custodial statements unless the defendant has been advised, among other things, of his right against self-incrimination, the consequences of the failure to assert the privilege, and the defendant's knowing and voluntary waiver of the right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966).

{¶ 39} A second circumstance where the right against self-incrimination is self-executing is the so called classic penalty scenario. *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). *Garrity* involved a situation where Garrity, a police officer, was asked investigative questions about a traffic ticket fixing scheme. Garrity was informed that if he did not answer the questions his employment would be terminated. Garrity was further informed that if he answered the questions his responses could be used against him in a future criminal prosecution.

{¶ 40} Garrity, having been placed between the indicated "rock and a hard place," answered the inquiries. Garrity's answers were then used against him in a subsequent prosecution for conspiracy. The Supreme Court ruled that in the context of "threat[s] of removal from office" the act of responding to interrogation was not voluntary. *Garrity* at 500. Garrity, that is, was compelled to be a witness against himself, and, thus, his statements, though he did not invoke his right against self-incrimination, could not be used against him in any criminal prosecution involving the traffic ticket fixing scheme.

{¶ 41} In *Minnesota v. Murphy*, the Supreme Court concluded, despite a probationer's requirement to meet with and be truthful with his probation officer or face revocation, that Murphy's admissions to his probation officer about criminal conduct unrelated to his probation status were not suppressible in a subsequent criminal prosecution based upon a classic penalty rationale. The court indicated that the inquiry was "whether Murphy's probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went farther and required him to choose between making incriminating statements and jeopardizing

his conditional liberty by remaining silent." *Minnesota v. Murphy* at 436, 104 S.Ct. at 1147. The Court concluded that "Minnesota did not attempt to take the extra, impermissible, step," and, as such, "Murphy's Fifth Amendment privilege was not self-executing." *Id.*

{¶ 42} The Court, in reaching this conclusion, noted that it had not been advised of any situation in which Minnesota "attempted to revoke probation merely because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct; and, in light of our decisions proscribing threats or penalties for the exercise of Fifth Amendment rights, Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation." *Id.* at 439, 104 S.Ct. 1148. The Court, in summary, concluded that Murphy was not "deterred from claiming the privilege by a reasonably perceived threat of revocation." *Id.*

{¶ 43} The *Murphy* Court, before reaching the discussed conclusion, did state "[t]here is… a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435, 104 S.Ct. at 1146.

{¶ 44} This gets us to *State v. Evans*, 144 Ohio App.3d 539, 760 N.E.2d 909 (1st Dist. 2001), which Stephens asserts supports a suppression conclusion in his case. The *Evans* court, using a classic penalty analysis, suppressed statements Evans, a juvenile offender, made during the course of court ordered treatment.

{¶ 45} Evans, when he was fifteen, was charged with assault, with the charge

ultimately being dismissed because the victim died and Evans could not otherwise be identified as the attacker. Evans, thereafter, was adjudicated delinquent for an unrelated assault offense. The juvenile court ordered that Evans be confined at, and receive treatment from, a residential treatment center.

{¶ 46} Evans, without dispute, was required to engage in therapy. Evans' failure to do so would have resulted in an inability to engage in group activities, cancellation of weekend home visits, and, ultimately, a transfer to a significantly more restrictive juvenile facility. The record indicated that while some residents were initially resistant to the therapy, "all juvenile residents eventually succumbed to the pressure and participated." *Evans* at 547, 760 N.E.2d at 915.

{¶ 47} Evans, as part of his indoctrination into therapy, was required to complete what was referred to as a "commitment offense paper," which required Evans to describe "all the crimes he had committed" whether they related to his current juvenile detention or not. *Id.* It seems that in the typical case, the "commitment offense paper" instructions included a statement that the recounting of unrelated offenses was for therapeutic, not prosecutorial, purposes. This statement, for unexplained reasons, was not included in the instructions provided Evans and no one informed him of his right against self-incrimination.

{¶ 48} Evans' initial attempt to complete the "commitment offense paper" was found deficient because it was not a sufficient recounting of his past criminal conduct. A counselor, in an attempt to assist Evans, gave him a list of past charges he had faced which included the assault which had evolved into a murder. Evans was specifically instructed to provide the details of each charge.

{¶ 49} Evans complied and what he wrote about the assault/murder was "essentially a confession to murder." *Evans* at 547, 760 N.E.2d at 916. Evans, thereafter and as a required condition of the program, made an oral confession to the murder during a group therapy session.

{¶ 50} A residential treatment supervisor, a week or so later, became aware of Evans' confession. It was ultimately decided that the confession should be reported to the police. Not surprisingly, a murder indictment followed soon thereafter.

{¶ 51} The First District ruled that Evans' confession contained in the "commitment offense paper" and the oral confession made during the group therapy session were subject to suppression under a classic penalty analysis. The court, it is noted, rejected an argument that *Miranda* warnings were required. The court further allowed a third confession that did not implicate Evans' court ordered therapy. The rationale for the suppression conclusion was based upon three factors: (1) Evans' therapy participation was not voluntary; (2) the penalties Evans faced if he failed to participate were significant; and (3) the penalties, imposed in an escalating fashion, were automatic. The court, based upon these reasons, held that "Evans was unconstitutionally forced to choose between a substantial penalty and self-incrimination." *Id.* at 558, 760 N.E.2d 924. Evans, accordingly, was "excused from failing to raise his privilege… " *Id.*

{¶ 52} The present situation, assuming *Evans* was correctly decided, is distinguishable. Stephens' treatment plan did call for him to admit past uncharged conduct, the treatment plan manual (Hrg. Ex. 2) did mention the prospect of a polygraph examination to monitor truthfulness, and successful completion of the Talbert House program was a condition of Stephens' judicial release. However, Stephens, in contrast

to Evans, was informed that an admission regarding a child would be reported to the police. Further, the treatment plan manual informed treatment participants that "there are certain circumstances in which your counselor is required to report offenses. You need to understand these circumstances." Hrg. Ex. 2, pg.17. Treatment participants were also told that if there was a "fear" about being "re-arrested", "talk to your counselor… [and] [a]sk for clarification of the confidentiality law." *Id.* There is nothing in the record to suggest that if Stephens had sought confidentiality clarification that he would have been compelled to report past sexual offenses or face a treatment failure conclusion, expulsion from Talbert House and judicial release revocation.

{¶ 53} Stephens was not pressed to admit past offenses. Peterson, in fact, was quite surprised by Stephens' admissions. Additionally, Peterson testified that Stephens faced adverse program consequences only if he was not forthcoming about the offense that led to his Talbert House commitment.

{¶ 54} The record simply does not support a conclusion that Stephens was forced to make a choice between making incriminating statements about past uncharged conduct or jeopardizing his judicial release status by remaining silent. Since Stephens was not forced to make such a choice, a classic penalty situation was not created, and Stephens' privilege against self-incrimination did not become self-executing. The trial court, under a classic penalty analysis, correctly overruled Stephens' motion to suppress.


Copies mailed to:

Heather N. Jans
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Dennis J. Adkins