DECISION.
{¶ 1} Defendant-appellant Douglas Tucker appeals from his conviction, after a jury trial, on one count each of aggravated burglary, attempted rape, kidnapping and felonious assault, along with two repeat-violent-offender specifications. After reviewing the errors assigned on appeal, we affirm.
 I. Attempted Rape {¶ 2} In the early morning hours of June 28, 2002, Jeresha Norviel, a young female college student, awakened in her Clifton apartment to find a man with a knife sitting on her bed. He threatened her with the knife and touched her breast while holding her neck locked in his arm. When he let go of her and turned his attention momentarily to undo his pants, Norviel ran free. Her intruder caught up with her at her bedroom door and punched her, causing her to fall to the floor. He continued to hit her, but she hit and kicked back and dug her nails into his face. He let up, and she ran out the front door of her apartment, out of the apartment complex, and across the street to another apartment building. The intruder exited from the back door of her apartment to the back staircase of the apartment complex, and then out a back door that led to the rear parking lot.
 {¶ 3} Once across the street, Norviel began to pound on the door of Hien Pham and awakened her with her screams. Pham called the police at 2:49 a.m., and Detective Kelly DaCulvey arrived at Pham's apartment soon after the call. Upon arrival, Detective DaCulvey found Norviel hysterical. Norviel stated that a man had broken into her apartment and had tried to rape her. She identified the intruder as Doug, the maintenance man of the apartment complex where she lived. Detective DaCulvey accompanied Norviel back into her apartment, where Norviel found the name of the apartment caretaker, "Geralyn Tucker," entered in her address book. Norviel explained that she thought Geralyn and Doug were married. This information allowed Detective DaCulvey to obtain a photograph of Doug Tucker that she showed to Norviel. After Norviel identified the man in the photograph as her attacker, a radio broadcast was sent out identifying Douglas Wayne Tucker, a white male, 52, as a wanted suspect for the attack. The police learned later that Geralyn and Doug had lived together as caretakers of the apartment complex, but were never married, and that Geralyn's last name was really Thompson.
 {¶ 4} Norviel was eventually transported to the Cincinnati Police Criminal Investigation Section, and then later to University Hospital for a rape examination. A serologist analyzed nail scrapings, pulled hairs and blood specimens taken from Norviel, but none of the samplings produced a result identifying a suspect. The police dusted for fingerprints in Norviel's apartment and in the apartment complex, but none of the prints were identifiable.
 {¶ 5} Detective Mike Miller, an investigator with the Personal Crimes Unit of the Cincinnati Police Division, arrived at Norviel's apartment complex around 4:30 a.m. Having been informed of the suspected perpetrator, Detective Miller went to the caretaker's apartment, where he found only Geralyn's granddaughter. Detective Miller learned that Douglas Tucker no longer lived with Geralyn in the caretaker's apartment, but resided with his brother, Jerry, on Selim Avenue. The police eventually took Tucker into custody after he arrived in his red truck at the Selim Avenue residence of his brother at 5:30 a.m. The left side of his face was scratched, as if he had been in a struggle. The police advised him of his rights and obtained Tucker's signature on a consent-to-search form. A subsequent search of Tucker's truck revealed keys to the main door of Norviel's apartment complex and to Geralyn's apartment, but not a key to Norviel's individual apartment.
 {¶ 6} Tucker was then transported to a Personal Crimes Unit interview room where he was again advised of his rights. After answering a few preliminary questions and allowing the police to take a few photographs, Tucker asked for an attorney. Later, Detective Miller told Tucker that he was being charged with aggravated burglary and rape. Tucker then asked, "Rape, don't that mean penetration?"
 {¶ 7} Tucker was subsequently charged in a four-count indictment with aggravated burglary, attempted rape, kidnapping, and felonious assault. Each count was accompanied by a specification that Tucker was a "Repeat Violent Offender," as defined in R.C. 2929.01. Tucker waived his right to a jury trial on the specifications.
 II. Changing Lawyers {¶ 8} The trial court appointed Peter Rosenwald to represent Tucker, but Tucker later filed a pro se motion to discharge him. Rosenwald withdrew, and the court appointed Thomas Rolfes to represent Tucker. After an unsuccessful hearing on Tucker's motion to suppress his statement to Detective Miller, Tucker's jury trial began. Before testimony commenced the following day, Tucker requested that Rolfes be removed as trial counsel, and that he be permitted to proceed pro se. But after discussing the issue with the trial court, Tucker decided that he did not want to proceed pro se. His request to remove defense counsel was denied, and the trial continued. Tucker was found guilty as charged on all counts. The court then continued the case for a hearing on the repeat-violent-offender specifications.
 {¶ 9} Prior to the hearing, Tucker filed a pro se motion for a new trial and a document captioned "motion for acquittal." As these motions contained unfavorable allegations against trial counsel, Rolfes was permitted to withdraw, and Chris McEvilley was assigned to the case. Subsequently, the court overruled Tucker's motions and found him guilty of the repeat-violent-offender specifications accompanying the attempted-rape and felonious-assault counts. The other two specifications were dismissed. Finally, the court found Tucker to be a sexual predator and imposed a 36-year term of incarceration for the convictions. On appeal, Tucker now raises six assignments of error.
 III. The Motion to Suppress the "Penetration" Statement {¶ 10} Tucker invoked his right to counsel after answering preliminary questions and allowing the police to take a few photographs. At that point, questioning ceased. Later, when told that he was being charged with aggravated burglary and rape, Tucker asked, "Rape, don't that mean penetration?" Tucker sought to suppress this statement below. The trial court's denial of Tucker's motion to suppress is the subject of Tucker's first assignment of error.
 {¶ 11} Appellate review of a trial court's ruling on a motion to suppress is a two-step process. First, the trial court's findings of facts are given deference and reviewed only for clear error.[1]
Second, the appellate court engages in a de novo review, without deference to the trial court's conclusions, as to whether those facts meet the applicable legal standards.[2] We begin with a review of an accused's privilege against self-incrimination — in a custodial setting after an attorney has been requested.
 {¶ 12} Under the Fifth Amendment's prohibition against compelling an accused to be a witness against himself, when a defendant in custody requests an attorney, the police must stop all interrogation until an attorney is present, unless the accused himself initiates further communication.[3] If the police improperly interrogate the accused after he has invoked his right to counsel, any incriminating statements are inadmissible against the accused.[4] "Interrogation" refers to either express questioning or its functional equivalent, including words or actions on the part of the police that the police should know are likely to elicit an incriminating response from the suspect.[5]
"Interrogation" does not include words or actions normally attendant to arrest and custody.[6] Further, if the accused makes a statement in response to words or actions by the police that do not constitute interrogation, the police are not prohibited from "merely listening" to his voluntary statement.[7]
 {¶ 13} Tucker posits that Detective Miller's statement to Tucker was equivalent to interrogation, as it was designed to elicit the incriminating response given, and was not just words normally attendant to arrest and custody. In support of this argument, he points to Detective Miller's testimony indicating that he knew that the victim had alleged only attempted rape, not rape, when he told Tucker that he was being charged with rape.
 {¶ 14} We reject Tucker's argument. The purpose of the strictures against self-incrimination is to prevent the police from using the coercive nature of confinement to extract incriminating statements that would not be given in an environment without restraints.[8] Under the facts of this case, Detective Miller's words to Tucker informing him of the charges against him did not violate these strictures. A police officer does not interrogate a suspect "simply by hoping that he will incriminate himself."[9] Tucker's incriminating response was not the result of police interrogation, but was rather a voluntary statement that was not subject to suppression.[10] The trial court did not err in denying the motion to suppress, and the first assignment of error is overruled.
 IV. The Right to Self-Representation {¶ 15} The accused in a state criminal trial has a constitutional right to represent himself without counsel, when his decision to do so is voluntary, knowing, and intelligent.[11] Tucker attempted to invoke this right several times after his trial had begun. In his second assignment of error, he argues that the trial court's failure to grant his request to proceed pro se was reversible error.
 {¶ 16} To invoke the right to self-representation, a defendant must timely and unequivocally request to proceed pro se. The trial court must then determine whether the defendant is competent to waive the right to counsel, and whether the defendant's waiver of counsel is knowing and voluntary. If the trial court denies the right of self-representation when properly invoked, the denial is reversible error.[12] Once a trial has begun, it is within the trial court's discretion whether to grant a defendant's request for self-representation.[13] In exercising this discretion, the court should consider the reasons given for the request, the quality of the present attorney's representation, and the defendant's "prior proclivity to substitute counsel."[14]
 {¶ 17} In this case, Tucker's request to represent himself was not timely or unequivocal. He requested to represent himself only after the hearing on the motion to suppress, voir dire, opening statements and direct and cross-examination of the first four witnesses for the state. This delay rendered the request untimely.[15] Further, Tucker did not file a written motion to invoke his right to self-representation, and his oral statements to the court did not amount to an unequivocal waiver of counsel. For example, after sensing Tucker's desire to proceed pro se, the trial court asked him if he were going to cross-examine witnesses in the case. Tucker responded, "To a certain degree. I don't want to cross-examine the alleged victim in the case." Tucker then explained at length his dissatisfaction with defense counsel's performance, as well as with the performance of his first appointed lawyer. After discouraging Tucker from taking the path of self-representation, the trial court eventually undertook a colloquy with Tucker to determine the sincerity of his request. Tucker changed his mind several times during this discussion. Just before the court was going to dismiss defense counsel from the case, Tucker stated that he was not going to represent himself. The trial court ended the discussion at that point and resumed the trial, informing Tucker that it did not want to hear any more about self-representation.
 {¶ 18} In light of the foregoing, we hold that the trial court did not abuse its discretion in denying Tucker's request to proceed pro se. In fact, the trial court proceeded exactly as it should have. Accordingly, the second assignment of error is overruled.
 V. Alleged Prosecutorial Misconduct {¶ 19} In his third assignment of error, Tucker argues that conduct of the prosecuting attorney deprived him of a fair trial. He cites multiple incidents of misconduct, some of which were not objected to at trial. Where there was no objection, Tucker has waived all but plain error.[16] Under the plain-error doctrine of Crim.R. 52(B), we must examine the error asserted in light of all the evidence properly admitted at trial and determine whether the jury would have convicted Tucker even if the error had not occurred.[17] Thus, reversible error occurs only if "but for the error, the outcome of the trial clearly would have been otherwise."[18]
 {¶ 20} To demonstrate his claim, Tucker argues that the prosecutor unnecessarily engaged in harassing and argumentative behavior during cross-examination of his brother, Jerry. The prosecutor asked Jerry how long Tucker had lived with Geralyn in the apartment complex. Jerry first said that Tucker lived with her for several months, but then he testified that Tucker never actually moved into the apartment with Geralyn; he just stayed there frequently. The prosecutor interrupted Jerry's testimony and accused Jerry of changing his answer. Defense counsel objected, and the trial court sustained the objection. We agree with Tucker that this cross-examination was improper, but the trial court acted on defense counsel's objection and directed the prosecutor to stop badgering and move on. In light of these facts, we cannot say that the misconduct deprived Tucker of a fair trial.[19]
 {¶ 21} The remaining allegations of prosecutorial misconduct were not objected to at trial and therefore cannot support a reversal of Tucker's conviction unless we find plain error. We decline to do so.
 {¶ 22} First, Tucker argues that his trial was replete with leading questions by the prosecutor to the state's witnesses. But Tucker provides only a reference to several pages of Officer DaCulvey's testimony to support this claim. We have reviewed this testimony and have determined that it does contain leading questions by the prosecutor. Officer DaCulvey testified, though, that she did have a stutter, which may have justified the use of leading questions. Even if it were not justified, any error in the use of leading questions was harmless in light of the evidence in this case. Next, Tucker alleges that the prosecutor asked two witnesses to engage in impermissible speculation. We find this allegation unfounded, and even if there were impermissible questioning, we hold any error to be harmless.
 {¶ 23} Finally, Tucker argues that the prosecutor made improper comments during closing argument, such as vouching for the state's witnesses and assuming facts not in evidence. We agree that the prosecutor erroneously vouched for the truthfulness of the witnesses' testimony when he stated that "they came in here and told the truth." An attorney is not permitted to express his personal belief or opinion as to the credibility of witnesses.[20] But the vouching was limited to one statement in the final argument. We refuse to find plain error where minor prosecutorial misconduct did not affect the trial result. Accordingly, the third assignment of error is overruled.
 VI. Ineffective Assistance of Trial Counsel {¶ 24} In his fourth assignment of error, Tucker argues that the trial court erred in denying his motion for a new trial on the basis of the ineffective assistance of trial counsel. Not so.
 {¶ 25} To prove ineffective assistance of counsel, the defendant must establish that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) the substandard performance prejudiced the defendant.[21] Prejudice from defective representation is sufficient to justify the reversal of a conviction only where the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[22]
 {¶ 26} Tucker presents several arguments to support his claim of ineffective assistance. First, Tucker argues that trial counsel Rolfes was deficient in representing Tucker without informing him of his prior representation of Geralyn Thompson in an unrelated criminal matter over a year before the crimes at issue occurred. Rolfes informed Tucker of this fact after withdrawing from the case in response to ineffective-assistance allegations made by Tucker in his pro se motion for a new trial. This motion, filed after the jury verdict, was supplemented by attorney Chris McEvilley to include a conflict-of-interest allegation. The trial court appointed McEvilley to replace Rolfes pursuant to Tucker's request for representation. Tucker specifically informed the court that Rolfes had represented Tucker's ex-girlfriend, Gerilyn (although referred to in the transcript as "Gerilyn," the judgment of conviction lists her name as "Jerilyn") Clair Thompson, before the common pleas court on March 1, 2001, on a charge of violating her community control. Thompson was found guilty and sent to the Department of Corrections to serve a six-month term of incarceration. In his amended motion for a new trial, Tucker averred that he was not apprised of this information until after Rolfe's representation ceased. The trial court overruled the motion for a new trial.
 {¶ 27} The Sixth Amendment guarantees that where there is a right to counsel, a defendant is entitled to the conflict-free assistance of counsel.[23] A possibility of a conflict exists in most cases where an attorney represents two clients that could have diverging interests.[24]
Additionally, courts have found a possibility of a conflict in other instances, such as where counsel's judgment could be affected by obligations to former clients, or even where counsel's representation of the defendant implicates personal or financial interests.[25]
 {¶ 28} Both the trial court and defense counsel have an affirmative duty to ensure conflict-free representation.[26] Where a trial court knows of a possible conflict of interest in the representation of a person charged with a crime, the trial court has an affirmative duty to inquire whether a conflict actually exists.[27] In cases involving counsel's active representation of conflicting interests, to demonstrate a violation of the Sixth Amendment where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known, a defendant must establish that a conflict of interest adversely affected counsel's performance.[28]
This standard, derived from the United States Supreme Court's decision inCuyler v. Sullivan,[29] is less demanding than the Strickland
standard, which requires a demonstration that counsel's inadequate performance undermined the reliability of the verdict.[30] (This standard is also applicable where the trial court has no duty to inquire and the defendant raises no objection at trial.)
 {¶ 29} The Supreme Court has not definitively stated whether theSullivan standard applies where, as here, there is a potential conflict rooted in counsel's obligations to former clients. The Court has strongly hinted that it does not.[31] We need not decide the issue, however, because Tucker has not alleged that an actual conflict affected his attorney's performance, and, therefore, he has failed to make a claim under either standard. Here, the representation of Thompson had ceased more than a year before the representation of Tucker. While trial counsel obviously should have disclosed this fact before undertaking Tucker's case, we hold that there was no conflict here.
 {¶ 30} Further, on the record before us, we can see no evidence that trial counsel's basic strategic decisions were influenced by the interests of his former client. Because the record is clear, we do not need to remand the case to the trial court for an inquiry as to whether an actual conflict existed.
 {¶ 31} This case is distinguishable from State v. Pelphrey,[32]
where we remanded the case to the trial court for a hearing to determine whether an actual conflict of interest existed, and, if so, to determine whether the defendant could meet the "manifest injustice" standard to vacate his guilty plea. In Pelphrey, the defendant challenged the trial court's acceptance of his guilty plea where his attorney was concurrently representing the victim of the offense on criminal charges in another court. In this case, Tucker is alleging that he was denied the effective assistance of trial counsel, and we have a developed record to evaluate this claim.
 {¶ 32} We, therefore, reject Tucker's claim that he was denied the effective assistance of trial counsel based upon trial counsel's prior representation of Thompson in an unrelated matter.
 {¶ 33} Tucker argues the trial counsel's performance was deficient in other ways. Tucker alleges that he was denied the effective assistance of counsel when his trial counsel failed to effectively argue that Tucker's statement made to police after he had asserted his Miranda
rights should have been suppressed. Tucker does not suggest how trial counsel might have successfully argued for suppression. We have reviewed the statement and the relevant case law and have found that the statement was voluntary and not the result of interrogation. Accordingly, trial counsel was not deficient in this regard.
 {¶ 34} Next, Tucker argues that trial counsel failed to effectively cross-examine witnesses for the state. He argues also that trial counsel's failure to request an in camera inspection of a state's witness's written or recorded statements prior to the cross-examination of the witness rendered counsel's performance ineffective. But Tucker has failed to specify which witnesses trial counsel ineffectively cross-examined and how this alleged failure rendered the verdict unreliable or the proceedings unfair. Further, the witnesses' written or recorded statements are not part of the record on appeal, and, therefore, we cannot determine the existence of any error or prejudice from trial counsel's alleged failure in this regard. The record we have before us indicates effective cross-examination.
 {¶ 35} Tucker argues also that trial counsel was defective in failing to object to the prosecutor's leading and speculative questions to the state's witnesses. While we have held that if the prosecutor used leading questions in direct examination of Officer DaCulvey, an objection by defense counsel was likely to have been overruled by the trial court in light of Officer DaCulvey's stuttering problem. Additionally, Tucker has not advanced how any deficiency by defense counsel in this regard prejudiced him. Tucker argues also that trial counsel was deficient where he failed to object to the prosecutor's request for impermissible speculation by two witnesses. We have not found any error in the prosecutor's questions, and, therefore, defense counsel had no duty to object. Further, Tucker has not pointed to any evidence demonstrating that he was prejudiced by any deficiency of defense counsel in this regard.
 {¶ 36} Tucker has failed to establish a constitutional claim of ineffective assistance of trial counsel. Accordingly, the trial court did not err in denying his motion for a new trial, and the assignment of error is overruled.
 VII. Sufficiency and Manifest Weight {¶ 37} In his final two assignments of error, Tucker argues that his conviction was not supported by sufficient evidence and that it was against the manifest weight of the evidence. When reviewing the sufficiency of the evidence to support a conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether such evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt.[33] In a challenge to the weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and decide whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice.[34]
 {¶ 38} Tucker attacks the jury's verdict because the state did not present any direct evidence to support the inference that Tucker was the perpetrator of the crimes. There were no fingerprints, no hairs, no blood, and no DNA evidence. Further, the knife was never found and no key was ever recovered. Tucker fails to note, however, that the state presented the testimony of the victim — who knew him — unequivocally identifying him as her assailant, as well as ample circumstantial evidence indicating that Tucker was the assailant. Circumstantial evidence carries the same weight as direct evidence.[35]
 {¶ 39} Tucker also submits that the jury lost its way concerning the identification of the perpetrator. We disagree. The victim in this case immediately identified Tucker as her assailant to Police Officer DaCulvey. The victim had seen Tucker at close range on several occasions prior to the attack and had had several conversations with him. During the attack, she was also able to see him at close range, and she was able to hear him threaten her repeatedly with the knife. Her testimony was not impeached and was supported by a plethora of circumstantial evidence.
 {¶ 40} Accordingly, the fifth and sixth assignments of error are overruled, and we affirm the trial court's judgment.
Judgment affirmed.
Gorman, P.J., and Winkler, J., concur.
[1] See State v. Evans, 144 Ohio App.3d 539, 549, 760 N.E.2d 909, citing Ornelas v. United States (1996), 517 U.S. 690, 699,116 S.Ct. 1657, and State v. Duncan (1998), 130 Ohio App.3d 77, 83,719 N.E.2d 608.
[2] Id.
[3] See Miranda v. Arizona (1966), 384 U.S. 436, 474,86 S.Ct. 1602.
[4] See Edwards v. Arizona (1981), 451 U.S. 477, 484-485,101 S.Ct. 1880.
[5] Rhode Island v. Innis (1980), 446 U.S. 291, 300-301,100 S.Ct. 1682.
[6] Id. at 301, 86 S.Ct. 1682.
[7] See Edwards at 485, 101 S.Ct. 1880.
[8] See Arizona v. Mauro (1987), 481 U.S. 520, 529-530,107 S.Ct. 1931.
[9] Id. at 529, 107 S.Ct. 1931.
[10] See U.S. v. Barnes (1999), 195 F.3d 1027, 1029.
[11] See Faretta v. California (1975), 422 U.S. 806, 95 S.Ct. 2525;State v. Gibson (1976), 45 Ohio St.2d 366, 345 N.E.2d 399, paragraph one of the syllabus.
[12] See State v. Reed, 74 Ohio St.3d 534, 535, 1996-Ohio-21,660 N.E.2d 456, citing McKaskle v. Wiggins (1984), 465 U.S. 168, 177,104 S.Ct. 944.
[13] See State v. Vrabel, 99 Ohio St.3d 184, 2003-Ohio-3193,790 N.E.2d 303, at ¶ 53.
[14] See State v. Reed (Nov. 6, 1996), 1st Dist. Nos. C-940315 and C-940322.
[15] See Vrabel at ¶ 53 (defendant's request to represent himself was untimely where made after voir dire had been completed and on the first day that evidence was to be presented); State v. Cassano,96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37 (defendant's request to represent himself was untimely where made three days before trial was to begin).
[16] See State v. Hill, 92 Ohio St.3d 191, 202, 2001-Ohio-141,749 N.E.2d 274.
[17] Id. at 203, 749 N.E.2d 274.
[18] See State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus.
[19] See State v. Fears, 86 Ohio St.3d 329, 332, 1999-Ohio-111,715 N.E.2d 136.
[20] See State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883;State v. Fields, 1st Dist. Nos. C-010720 and C-010688, 2002-Ohio-4451, ¶ 21; DR 7-106(C)(4).
[21] See Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
[22] Strickland at 694, 104 S.Ct. 2053.
[23] See State v. Dillon, 74 Ohio St.3d 166, 167, 1995-Ohio-169,657 N.E.2d 273, 275, citing State v. Gillard, 64 Ohio St.3d 304, 312,1992-Ohio-48, 595 N.E.2d 878; See State v. Pelphrey, 149 Ohio App.3d 578,582, 2002-Ohio-5491, 778 N.E.2d 129, at ¶ 9.
[24] See Cuyler v. Sullivan (1980), 446 U.S. 335, 348,100 S.Ct. 1708; State v. Dillon, 74 Ohio St.3d 166, 168, 1995-Ohio-169,657 N.E.2d 273.
[25] See Mickens v. Taylor (2002), 535 U.S. 162, 174,122 S.Ct. 1237.
[26] See Dillon, supra, at 167-168, 657 N.E.2d 273.
[27] See State v. Gillard, 64 Ohio St.3d 304, 1992-Ohio-48,595 N.E.2d 878, syllabus.
[28] See Mickens v. Taylor (2002), 535 U.S. 162, 174-175,122 S.Ct. 1237 (assuming but not deciding whether this lessened Strickland standard applies in cases involving alleged conflicts based upon sequential representation instead of multiple representation).
[29] (1980), 446 U.S. 335, 100 S.Ct. 1708.
[30] See State v. Dillon, 74 Ohio St.3d 166, 169, 1995-Ohio-169,657 N.E.2d 273.
[31] See Mickens at 175, 122 S.Ct. 1245.
[32] 149 Ohio App.3d 578, 2002-Ohio-5491, 778 N.E.2d 129.
[33] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[34] Id. at 387.
[35] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus.