[Cite as *State v. Smith*, 2025-Ohio-3131.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240579 |
| | | TRIAL NO. B-2105895 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| ARTHUR SMITH, | : | *JUDGMENT ENTRY* |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 9/3/2025 per order of the court.**

**By:**_____
  **Administrative Judge**

[Cite as *State v. Smith*, 2025-Ohio-3131.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                         |   |            |           |
|-------------------------|---|------------|-----------|
| STATE OF OHIO,          | : | APPEAL NO. | C-240579  |
|                         |   | TRIAL NO.  | B-2105895 |
| Plaintiff-Appellee,     | : |            |           |
|                         |   |            |           |
| vs.                     | : |            |           |
|                         |   |            |           |
| ARTHUR SMITH,           | : | *O P I N I O N* |      |
|                         |   |            |           |
| Defendant-Appellant.    | : |            |           |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 3, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*William F. Oswall, Jr.*, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} A jury found defendant-appellant Arthur Smith guilty of murder, accompanied by firearm specifications, felonious assault, and having weapons while under a disability, in connection with the 2021 shooting death of A.M.[1] The trial court sentenced Smith to 24 years to life in prison. On appeal, Smith challenges the denial of his motion to suppress the statements he made to police following his arrest, the admission of other-acts evidence at trial, and the weight of the evidence presented against him. Smith also argues on appeal that prosecutorial misconduct occurred during closing argument and that he received ineffective assistance of counsel when his counsel failed to object to two jury instructions. For the reasons set forth below, we overrule Smith's assignments of error and affirm his convictions.

### *Factual and Procedural Background*

{¶2} On November 24, 2021, the State indicted Smith with two counts of murder, felonious assault, having weapons while under a disability, and tampering with evidence stemming from the November 7, 2021 shooting of A.M. According to the State, Smith and A.M. had a brief argument outside the College Hill apartment of Smith's former girlfriend, S.B., which resulted in Smith pulling out a gun and shooting A.M. Emergency personnel took A.M. to the hospital, and hospital staff performed multiple procedures in attempting to save A.M.'s life. Three days after the shooting, however, A.M. died from complications of the gunshot injury. Smith had yet to be located by police when A.M. succumbed to his injuries. Police involved the fugitive apprehension unit, who located Smith at an address in Price Hill on November 17, 2021. Smith was then arrested.

---

[1] The felonious assault count merged with the felony murder count for purposes of sentencing.

3

{¶3} Prior to trial, Smith filed a motion to suppress the statements he made to police following his arrest. Smith argued that police violated his *Miranda* rights by continuing to question him after he had asserted his right to counsel. The trial court denied Smith's motion to suppress, and Smith's case proceeded to a jury trial.

{¶4} At trial, the State presented evidence from S.B., Smith's former girlfriend. S.B. testified that she and Smith had been in a relationship for about a year at the time the shooting. The night before the shooting, S.B. and Smith had been in an argument that started at a bar. S.B. admittedly had consumed too much alcohol that night, and she left the bar with Smith, who drove S.B. home in S.B.'s car. On the way to S.B.'s apartment, Smith stopped at a gas station where the couple continued to argue, and Smith told S.B. that he was going to set her on fire. S.B. testified that at this point she felt afraid of Smith. Smith eventually dropped off S.B. and her vehicle at S.B.'s apartment, and Smith went home. However, Smith took S.B.'s apartment key with him, so S.B. slept in her car.

{¶5} At some point within the hours after Smith left S.B.'s apartment, S.B. located a spare apartment key in her car's glovebox. Once inside her apartment, S.B. began packing up Smith's belongings. S.B. then took Smith's belongings to his place where Smith and S.B. continued to argue. S.B. testified that Smith tried, unsuccessfully, to cut the wiring under the hood of S.B.'s vehicle. S.B. managed to leave Smith's and return to her apartment.

{¶6} When S.B. returned home, she called A.M., an acquaintance whom she knew through Facebook. A.M. had done odd jobs for S.B. in the past, and S.B. wanted A.M. to come over as soon as possible to change the locks on her apartment door so that Smith could no longer gain access. S.B. went to Walmart that same day to purchase a new lock. When she returned home, A.M. came over to help her change

the locks on the front door.

{¶7} S.B. testified that while A.M. was changing her locks, she was afraid Smith would show up unannounced at her apartment. To make matters worse, S.B. testified that A.M. and Smith did not like each other. S.B. paced back and forth in her apartment while A.M. worked. S.B. then heard Smith's voice say, "What's up?" A.M. and Smith each exchanged, "What's up?" multiple times. S.B. heard scuffling and stumbling, and then she heard a loud pop. S.B. ran to her window overlooking the front of the apartment building. She saw Smith punch A.M., and A.M. fall to the ground. Smith then started walking back towards S.B.'s apartment. S.B. was afraid Smith would hurt her, so she ran out the back door of her apartment into the woods and called 911.

{¶8} The State played S.B.'s 911 call for the jury. S.B.'s 911 call reveals an out-of-breath S.B. claiming that her former boyfriend, Smith, had shot a man at her apartment, and that she believed Smith was still at the scene. S.B. stated that the victim had come over to her apartment to change her locks when she heard a gunshot and heard the man scream.

{¶9} The State also presented testimony from S.B.'s neighbor, C.J. C.J. testified that, on the day in question, she awoke from a nap to the sound of a firecracker and heard someone tumbling down the steps. She looked out of her front window and saw a man slumped over a car and Smith, whom she recognized, walking away. C.J. called 911, and the State played her call for the jury. In C.J.'s 911 call, she tells the operator that a man had been shot and that the shooter had left the scene. C.J. also reported that the shooting victim was barely awake, had a weak pulse, and was not really conscious.

{¶10} Officer Kurtis Latham responded to the reported shooting at S.B.'s

5

apartment. Latham testified that as soon as he drove into the apartment complex, a frantic S.B. flagged him down and got into his vehicle. Latham saw a man—A.M.— lying on the ground. A.M. had been shot and was still alive, but was not responsive. Latham did not see a weapon lying anywhere near A.M. He walked up the stairs to S.B.'s apartment to secure the area and found a firearm cartridge and projectile on the stair landing. Latham saw S.B.'s apartment door ajar and the lock half off. He entered S.B.'s apartment, but he did not see a suspect or weapon.

{¶11} The State played Latham's body-worn camera video for the jury. On the video, S.B. tells the officer that she and Smith had an argument the night before and that A.M. had come over to her apartment to change her locks. While A.M. changed her locks, S.B. could see Smith and A.M. fighting from inside her apartment. She heard a gunshot, and she ran out the back of her apartment. The video from Latham's body-worn camera also depicts another officer on the scene. In the video, that officer states to Latham that it had appeared as if A.M. may have shot himself.

{¶12} The State also presented testimony from Detective Tracy Jones, who responded to the shooting following Latham's arrival. Jones testified that he had searched S.B.'s apartment for a weapon and could not find one; however, S.B. told Jones that Smith carried a small black gun. Based on S.B.'s statement, the small bullet hole in A.M.'s shirt, and a .380-caliber projectile recovered from the scene, Jones determined that the gun used in the shooting was a small caliber weapon. Jones acknowledged that he had interviewed S.B. a second time ten days after the shooting and that in her second interview, S.B. denied that Smith carried a weapon. S.B. testified at trial, however, that her original statement to Jones was true and that Smith did carry a weapon. S.B. testified that she had been communicating with Smith in the days following the shooting and that she did not want anything to happen to Smith.

6

{¶13} A.M.'s sister also testified for the State. A.M.'s sister testified that she had known Smith for about 20 years and that they had grown up in the same neighborhood. The day A.M. was shot, A.M.'s sister and other family members and friends assembled at the hospital for an update on A.M.'s condition. While at the hospital, a family friend received a phone call from "Nuke"—a nickname for Smith. A.M.'s sister began recording the conversation. In the call, the caller says that he is going to a casino in "Indy."

{¶14} The State also presented testimony from a firearm expert, as well as Dr. Karen Looman from the coroner's office, who performed A.M.'s autopsy. The firearm expert testified that the cartridge case found in the staircase outside S.B.'s apartment was a .380 auto cartridge, which is consistent with a .380 auto bullet. Dr. Looman testified that A.M. had been shot in the torso and that the gunshot caused A.M. to bleed internally. When questioned as to whether the gunshot could have been self-inflicted, Dr. Looman conceded that it was possible, but that because A.M. was left-handed, it would have been unlikely that A.M. could have turned the weapon backward and down at the angle at which the gunshot moved through his torso.

{¶15} Finally, the State introduced a recording of Smith's post-arrest interview with homicide detectives. In the interview, Smith tells detectives that he was not at S.B.'s apartment on the day of the shooting. According to Smith, he went to a Bengals tailgate that day and then out of town. Smith told detectives that he had intended on turning himself in on the day of his apprehension.

{¶16} Following trial, the trial court granted a judgment of acquittal as to the tampering with evidence charge. The jury found Smith guilty of felony murder, felonious assault, and having weapons while under a disability, but acquitted him of murder as an intentional homicide. The trial court merged the felonious assault

charge with the murder charge. The trial court sentenced Smith to an aggregate term of 24 years to life in prison.

{¶17} Smith appeals.

### *Analysis*

{¶18} In five separate assignments of error, Smith challenges the trial court's denial of his motion to suppress, the admission of improper evidence under Evid.R. 404(B), the weight of the evidence adduced to support his convictions, prosecutorial misconduct in closing argument, and ineffective assistance of counsel for his trial counsel's failure to object to two jury instructions.

### *A. Motion to Suppress Smith's Statements to Police*

{¶19} We address Smith's fourth assignment of error first, in which Smith argues that the trial court erred in denying his motion to suppress the post-arrest statements he made to police when police arrested him on November 17, 2021, ten days after the shooting. Smith told police he was at a Bengals tailgate and then went out of town on the day of the shooting. Smith contends these statements should have been suppressed because they were made to police after Smith was Mirandized and invoked his right to counsel. The trial court, however, denied Smith's suppression motion because he offered these statements to police voluntarily and not in response to a custodial interrogation.

{¶20} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. This court must accept a trial court's findings of fact if they are supported by competent, credible evidence, but we review de novo the application of the law to those facts. *Id.*

{¶21} In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the United States Supreme Court established procedural safeguards to protect a defendant's Fifth

Amendment right against self-incrimination, including a suspect's right to have counsel present during a custodial interrogation. Once a suspect is in custody and requests counsel during a police interrogation, the interrogation must stop, and any statement made during a custodial interrogation after a defendant has invoked the right to counsel must be suppressed. *State v. Carr*, 2010-Ohio-2764, ¶ 15 (1st Dist.); *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981).

{¶22} For purposes of *Miranda*, a custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way[.]" *Miranda* at paragraph one of the syllabus. Police questioning can be by either words or actions, which, when directed toward a suspect, are likely to elicit an incriminating response. *State v. Tucker*, 2003-Ohio-6056, ¶ 12 (1st Dist.), citing *Edwards* at 484-485. Statements made by a suspect to police, which are not made in response to an interrogation, are considered voluntary statements and are not prohibited by *Miranda. Tucker* at ¶ 14, citing *Edwards* at 485.

{¶23} Applying these principles, we agree with the trial court's conclusion that Smith was not subjected to a custodial interrogation at the time he indicated that he attended the Bengals tailgate and then went out of town. The evidence presented by the State at the suppression hearing, which included a video and transcript of Smith's police interview, indicate that Smith volunteered this information after indicating that he wanted to communicate with an attorney.

{¶24} At the beginning of the transcript, Smith told an unidentified person that he "need[s] to reach out to an attorney. I think it's in that phone." The unidentified person informed Smith that detectives had his phone. The person and Smith then talked back and forth about how much longer Smith would need to wait

for the detectives to arrive.

{¶25} The transcript and video later depict Smith waiting until Jones and Detective Ashley Jenkins arrive. Jenkins read Smith his *Miranda* rights and asked if Smith understood them. Smith responded in the affirmative and signed a *Miranda* waiver, which the State also introduced as an exhibit at the suppression hearing. Smith then told detectives that he does not know his "lawyer's number by heart," and he wanted to call his lawyer.

{¶26} Smith later tells Jenkins, "I want to speak to my lawyer." In response, Jenkins then states, "[I]f you want to call your lawyer, we're gonna stop talking, and we're just gonna – to take you down to the Justice Center and you can call your lawyer there, okay?" Smith reiterates to the detectives that they have his phone and that he does not have his lawyer's phone number memorized.

{¶27} Without any further questioning from detectives, Smith states, "Whatever situation that happened – you know what I'm saying? – I really wasn't there. I was attended – like, I was on social media attending to a damn Bengals tailgate." Again unprompted, Smith tells detectives that he does not know what is going on, and that after tailgating, he went out of town. Smith then discusses social media and states, "[S]o it's like they accuse me of something I don't know about, so I need a lawyer." Jenkins then asks Smith again if he wants to speak with detectives, or if he wants a lawyer. Smith states that he wants a lawyer and that he is "done." The interview concludes.

{¶28} As this recounting demonstrates, Smith did not provide the information as to his whereabouts on the day of the shooting in response to any question from detectives. In fact, quite the opposite is true. After Smith indicated he wanted to speak to his attorney, Jenkins informed him that they would "stop talking." With no

10

question pending, Smith volunteered that he was not at the scene and was instead visible on social media at a Bengals tailgate. Because these statements were voluntary, they did not violate Smith's *Miranda* rights. *See Tucker*, 2003-Ohio-6056, at ¶ 14 (1st Dist.).

{¶29} We therefore conclude that the trial court did not err in denying Smith's motion to suppress. Accordingly, we overrule Smith's fourth assignment of error.

### B. *Admission of Other-Acts Evidence*

{¶30} In his first assignment of error, Smith argues that the trial court erred in admitting other-acts evidence when the trial court permitted S.B. to testify, over Smith's objection, that Smith had threatened to set S.B. on fire the night before the shooting.

{¶31} Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." For Evid.R. 404(B) evidence to be admissible, it must be relevant to a nonpropensity purpose, such as motive, intent, plan, or identity, and that nonpropensity purpose must be offered for a material, disputed issue. *State v. Hartman*, 2020-Ohio-4440, ¶ 26. These inquiries are legal questions that we review de novo. *State v. Mincey*, 2023-Ohio-472, ¶ 12 (1st Dist.), citing *Hartman* at ¶ 22.

{¶32} Furthermore, in admitting the other-acts evidence, the danger of unfair prejudice cannot substantially outweigh the probative value of the evidence under Evid.R. 403. *Hartman* at ¶ 30. It is best practice for a trial court to expressly conduct its probative value/prejudice weighing analysis on the record. *State v. Echols*, 2024-Ohio-5088, ¶ 40. We review the unfair prejudice determination for an abuse of discretion. *Mincey* at ¶ 12, citing *Hartman* at ¶ 22. A trial court that admits other-

acts evidence under Evid.R. 404(B) and 403 must, upon request, issue a limiting instruction that explains the limited purposes for which the jury may and may not consider other acts evidence. *Echols* at ¶ 46.

**{¶33}** At trial, S.B. testified regarding her argument with Smith the night prior to the shooting. S.B. testified that on the way home from the bar that night, they stopped at a gas station where Smith threatened to set her on fire. Smith objected to this portion of S.B.'s testimony under Evid.R. 404(B). In response, the State argued to the trial court that S.B.'s statement formed "the background to the incident at hand" and was admissible for this purpose. The trial court overruled Smith's objection and admitted S.B.'s statement.

**{¶34}** Our de novo review of the record supports the trial court's determination that the State did not offer S.B.'s testimony about her interaction with Smith at the gas station to show his propensity to commit the charged crimes. Rather, S.B.'s testimony in this regard was relevant to demonstrate a common plan. Common plan evidence concerns "other acts [that] form the 'immediate background' of the present crime: they are typically either part of the 'same transaction' as the crime for which the defendant is on trial or they are part of 'a sequence of events' leading up to the commission of the crime in question." *Hartman*, 2020-Ohio-4440, at ¶ 41, citing Weissenberger, *Federal Evidence*, § 404.18 (7th Ed. 2019). Common plan evidence is therefore "'relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute.'" *Id.*, quoting McCormick, *Evidence*, § 190, at 448-449 (2d Ed. 1972).

**{¶35}** The State presented Smith's threat to S.B. at the gas station in the context of S.B.'s broader testimony regarding the events leading up to A.M.'s shooting. S.B. recounted her argument with Smith, his threat, and her fear of him, which then

led S.B. to call A.M. the following day to change her apartment locks to keep Smith out of her apartment. A.M. was in the middle of changing S.B.'s locks when, according to S.B., Smith arrived and an altercation ensued. According to S.B., Smith's threat to her occurred just hours before Smith arrived at her apartment where the shooting occurred, and therefore, Smith's threat to S.B. provides the context for A.M.'s shooting death. As such, S.B.'s statement regarding Smith's threat is relevant to explain Smith's identity as the shooter and his intent when the shooting occurred, both of which are permissible purposes for the admission of other-acts evidence under Evid.R. 404(B).

{¶36} Smith also argues that even if the trial court did not err under Evid.R. 404(B) in admitting Smith's prior threat, the trial court should have excluded the evidence as unduly prejudicial under Evid.R. 403(A). But the trial court did not abuse its discretion in impliedly determining that the probative value of S.B.'s testimony was not substantially outweighed by the risk of unfair prejudice to Smith. The State did not offer the evidence to appeal to jurors' emotions, but instead to set the stage for the confrontation between Smith and A.M. While the trial court could have more expressly analyzed the question, as the Ohio Supreme Court has indicated it is best practice to do, its admission of S.B.'s statement under Evid.R. 403 was not an abuse of its discretion.

{¶37} Finally, we note that the trial court did not issue a limiting instruction advising the jury as to the purposes for which it could consider S.B.'s testimony about the gas station incident. But Smith does not challenge this aspect of Evid.R. 403(B) on appeal, and we need not consider it in our review.

{¶38} Therefore, because the trial court did not err in admitting Smith's threat to S.B. the night prior to the shooting under Evid.R. 404(B) or 403, we overrule Smith's first assignment of error.

### C. Weight of the Evidence

{¶39}   In his fifth assignment of error, Smith argues that his convictions were against the manifest weight of the evidence.  Smith specifically challenges his murder conviction and argues that the jury lost its way in finding him guilty of murder.

{¶40}   When considering a challenge to the weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses to determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice such that the defendant's conviction must be reversed.  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶41}   In challenging the weight of the evidence, Smith argues that no witness saw who shot A.M., and, at most, two witnesses placed Smith at the scene of A.M.'s death.  S.B. admitted in the 911 call that she did not see what happened when the gun discharged, and she did not know who started the physical altercation between Smith and A.M.  C.J., S.B.'s neighbor, likewise did not see who shot A.M.—C.J. only saw Smith leaving the scene.  Smith argues that it could have been possible, as suggested by a police sergeant on the scene, that A.M. shot himself.  Smith also points out that Dr. Looman from the coroner's office admitted that it could have been possible for A.M. to have shot himself.

{¶42}   After reviewing the record, we cannot say that the jury clearly lost its way in finding Smith guilty.  S.B. testified that the day before A.M. was shot at S.B.'s apartment, S.B. and Smith had a heated argument.  Smith even threatened to set S.B. on fire. The next day, S.B. returned Smith's belongings and then called A.M. to change her locks to keep Smith out.  While A.M. was changing S.B.'s locks, S.B. was scared that Smith might arrive unannounced at her apartment.  S.B.'s fears came true.  Smith

arrived at S.B.'s apartment and encountered A.M., who was in the middle of changing S.B.'s locks. S.B. stayed inside her apartment, but she heard a physical struggle between Smith and A.M., followed by a gunshot. When S.B. ran to her front window, she saw Smith punch A.M. in the parking lot.

{¶43} While A.M. lay injured in the parking lot, Smith left the scene. C.J., S.B.'s neighbor, saw Smith walking away. When police arrived, A.M. was still alive, but unconscious. Police could not find a firearm anywhere on the scene. S.B. told the detective that she knew Smith carried a small gun, which would have been consistent with the weapon used to shoot A.M. based on the projectile found at the scene and the bullet hole in A.M.'s jacket.

{¶44} Dr. Looman, who performed A.M.'s autopsy, acknowledged the possibility that A.M. could have shot himself, but her testimony was clear that she did not believe that was the case based on the placement of the bullet hole in A.M.'s body, the close range in which A.M. had been shot, and that A.M. was left-handed. The only evidence offered to support Smith's argument that A.M. may have shot himself was an off-hand comment made by an officer on the scene in the minutes after the shooting, captured on Latham's body-worn camera, where the officer states that A.M. may have shot himself. The evidence is clear, however, that once police concluded their investigation, they believed that Smith had shot A.M.

{¶45} Finally, the jury was able to weigh the credibility of Smith's apparent alibi. The day of the shooting, A.M.'s sister recorded a phone call between "Nuke"— Smith's nickname—and a family friend, in which the caller states that he was at a casino in Indianapolis. After his arrest, Smith told police that he was not at S.B.'s apartment the day A.M. was shot, even though S.B. and a neighbor saw him there, and instead Smith told police he was at a Bengals tailgate and then in Indianapolis.

15

**{¶46}** Reviewing the evidence presented at trial, Smith's convictions were not against the manifest weight of the evidence, and we overrule Smith's fifth assignment of error.

### D. *Prosecutorial Misconduct During Closing Argument*

**{¶47}** In his second assignment of error, Smith argues that his convictions must be reversed based on prosecutorial misconduct that occurred during closing argument.

**{¶48}** "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Rouzier*, 2021-Ohio-1466, ¶ 13 (1st Dist.), citing *State v. Smith*, 14 Ohio St.3d 13 (1984).

**{¶49}** Smith argues that the prosecutor committed misconduct during closing argument when, in referring to Smith's defense team, the prosecutor stated, "[W]hatever you will believe is what they want you to buy." Smith objected, and the trial court sustained the objection and instructed the jury to disregard the prosecutor's statements about "buying." Later, the prosecutor stated that defense counsel had the "job" of getting at least one juror to acquit Smith. Smith again objected. The trial court sustained the objection and instructed the jury to disregard the prosecutor's comments about the role of the defense attorneys. In response to the trial court's curative instruction, the prosecutor remarked, "I think what I'm saying is fair comment, but I'll move on." Smith objected, and the trial court instructed the jury to disregard the prosecutor's argument, because it was not meant for the jury.

**{¶50}** Smith argues that the prosecutor's comments in closing arguments were intended to denigrate defense counsel. "The latitude afforded a prosecutor does not permit denigration of the role of defense counsel or a personal attack on counsel."

*State v. Carter*, 2017-Ohio-1328, ¶ 19 (1st Dist.). In support of his argument, Smith relies on an Ohio Supreme Court case in which the prosecutor's closing argument referred to defense counsel as having presented "lies," "garbage lies," a "smokescreen," and a "well rehearsed lie." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). The prosecutor in *Smith* accused defense counsel of perjury by manufacturing lies in court. *Id.*

**{¶51}** In this case, although the prosecutor's comments referred directly to defense counsel, and not the evidence, the comments did not rise to the level of prejudicial error affecting Smith's substantial rights. The prosecutor's comments that "whatever you will believe is what they want you to buy" and that the defense had the "job" of getting at least one juror to acquit Smith were not pervasive. Importantly, Smith objected to each of the prosecutor's problematic comments in closing argument, and the trial court sustained the objections and issued a curative instruction. An appellate court presumes that the jury follows the instructions given by a trial court. *State v. Gatewood*, 2023-Ohio-3497, ¶ 15 (1st Dist.).

**{¶52}** Therefore, Smith has not shown prosecutorial misconduct warranting reversal of his convictions. We overrule Smith's second assignment of error.

### E. Ineffective Assistance of Counsel

**{¶53}** In his third assignment of error, Smith argues that his counsel was ineffective for failing to object to the jury instructions.

**{¶54}** To prevail on a claim of ineffective assistance of counsel, a defendant must show deficient performance by trial counsel and must also show that the deficient performance prejudiced the defendant, meaning a reasonable probability exists that, but for counsel's error, the result of the proceeding would have been different. *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *Strickland v. Washington*, 466 U.S. 668, 687-694 (1984).

*1. Flight Instruction*

**{¶55}** Smith argues that defense counsel was ineffective for failing to object to the flight instruction given by the trial court. A defendant's flight, "mean[ing] some escape or affirmative attempt to avoid apprehension by the police" is admissible to show consciousness of guilt, and a flight instruction is appropriate where sufficient evidence exists to support that charge. *State v. Morrissette*, 2018-Ohio-3917, ¶ 51 (1st Dist.).

**{¶56}** The trial court's jury instruction entitled "consciousness of guilt" stated that "[t]estimony has been admitted that the defendant fled the scene," and that "leaving the scene alone does not raise a presumption of guilt." The instruction further provided that if the jury found that "the facts do not support that the defendant left the scene or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motive was, then you should not consider this evidence for any purpose." Finally, the instruction provided that if the jury found "that the facts support that the defendant engaged in such conduct" and if the jury decided that "the defendant was motivated by a consciousness or awareness of guilt," then the jury could, but was not required, to consider the evidence of flight in determining whether Smith committed the crimes charged.

**{¶57}** According to Smith, the trial court erred in issuing a flight instruction because there was no evidence that Smith attempted to flee the jurisdiction. We disagree. Here, the State presented sufficient evidence that Smith fled the scene after the shooting. S.B. and her neighbor both testified that they heard a loud sound, that Smith left the scene, and that A.M. had been shot. Police could not locate Smith until ten days after the shooting with assistance from the fugitive apprehension unit. After his arrest, Smith told police that he had been out of town. Smith's flight from the scene

18

is particularly relevant here where the defense's theory of the case was that A.M. could have accidentally shot himself. Therefore, because the flight instruction was appropriate, Smith cannot show that counsel's failure to object to the instruction constituted ineffective assistance. *See Strickland*, 466 U.S. at 687-694.

*2. Felony Murder Instruction*

**{¶58}** Smith also argues that his counsel was ineffective for failing to object to the trial court's murder instruction, which referred to proximate causation without defining "proximate."

**{¶59}** Count 2 of the indictment charged Smith with felony murder under R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not [voluntary or involuntary manslaughter]." As to the felony murder charge, the trial court instructed the jury that they must find beyond a reasonable doubt that Smith caused A.M.'s death as a proximate result of Smith knowingly committing or attempting to commit felonious assault. The trial court did not define "proximate result," but instead instructed the jury that "cause" meant "an act or failure to act which in a natural and continuance sequence directly produces physical harm to a person, and without which it would not have occurred."

**{¶60}** Smith does not explain how the trial court's failure to define "proximate result" in the murder charge in the jury instructions prejudiced him. But the undisputed evidence presented at trial showed that A.M. died as a result of a gunshot injury. The trial court instructed the jury as to the definition of "cause," and courts have recognized the similarities between the definition of proximate result and proximate cause. *See, e.g., State v. Hill*, 2018-Ohio-3564, ¶ 6 (8th Dist.) (noting that

in the involuntary manslaughter statute, a "'proximate result' is akin to 'proximate cause.'"); *State v. Crawford*, 2022-Ohio-1509, ¶ 15 ("In referencing the 'proximate result' of death 'cause[d]' by the defendant's actions, the involuntary-manslaughter statute is simply talking about 'proximate cause.'").  Because Smith cannot show prejudice regarding the trial court's jury instruction on the felony murder charge, his ineffective assistance argument fails.  *See Strickland*, 466 U.S. at 687-694.

{¶61}  Smith has not shown that he received ineffective assistance of counsel regarding counsel's failure to object to the jury instructions.  Therefore, we overrule Smith's third assignment of error.

### *Conclusion*

{¶62}  Having overruled Smith's five assignments of error, we affirm the trial court's judgment convicting Smith of murder and having weapons while under a disability.

Judgment affirmed.

**ZAYAS** and **MOORE, JJ.,** concur.